## Bolton *against* Colder and Wilson.

A stage coach passing upon a public highway, is protected by an act of congress from wilful and wanton obstruction or delay; but in every other respect they are on a footing with all other carriages.

A traveller may use the middle or either side of a public road at his pleasure, and without being bound to turn aside for another travelling in the same direction, provided there be convenient room to pass on the one hand or on the other.

Parol proof of a particular custom should not be suffered to control the general law of the land.

THIS was an action of trespass on the case, against the defendants as the proprietors of the Reading and Harrisburg stage coach, tried before Mr Justice *Rogers*, at a circuit court for Dauphin county, the 16th of April 1833.

The plaintiff called *Henry Schantz*, who testified as follows:

I was a passenger in the stage on the 4th February 1832. Stopped at *Koon's* tavern, *Bolton* was before us, coming to Harrisburg; the stage overtook *Bolton*, he turned out to the left hand coming up; *Bolton* was riding in a dearborn wagon; *Philip Ressel*, the driver, drove against *Bolton's* wagon and upset it; he drove on about a quarter of a mile without stopping. We then got out of the stage; we told him to stop, that the man could not get out, he was lying in the wagon. *Nagle, Dubbs* and *Karch* went back; we took him out, righted his wagon and then put him in again. *Dubbs* got in with *Bolton*, and drove the wagon to Harrisburg. *Bolton* could not rise or help himself; appeared to suffer much pain; complained that his leg was broken. I was looking out of the stage, and saw all; *Bolton* had turned out as far as he could without upsetting himself, more than half the road, almost the whole road; *Philip* did not turn out at all; he struck the wheel of *Bolton;* the stage could have passed easily to the right. It was raining and snowing. I was looking out of the window of the stage to see how far *Bolton* was ahead of the stage; the hind wheel of the stage struck the wagon and turned it over; there was room enough for two stages to pass to the right of *Bolton's* wagon; *Philip* kept straight on without turning to either side; he drove the whole way at a pretty fast trot. It was on the turnpike from Harrisburg to Lebanon, about three miles from Harrisburg. When I looked out, *Bolton* was about four or five yards before the stage; *Nagle* and I looked out at the same time; stage not open before, the curtains were all down; three seats in the stage; I sat on the hind seat; *Bolton's* wagon was covered, don't know whether open or closed behind; I don't know that the stage horses were frightened; I can't say whether I went down the hill or up, after we left the stage to go back. We all told the driver to stop;

[Bolton v. Colder and Wilson.]

when I first saw *Bolton* he was on the left side of the road, the stage struck the hind wheel of *Bolton's* wagon.

We told *Philip* more than once to stop; cannot say whether he heard us; there was snow enough on the ground to mark the track of the stage and wagon, I looked at the tracks when we went back; we discovered that *Bolton's* wagon had turned out to the left and that the stage had not; we looked on purpose to see whether the stage had turned out, we went back four or five steps to see; from the tracks of *Bolton's* wagon we could see he was turning to the left all the while; we looked out of the stage on the side next to *Bolton; Bolton* could not have got up without assistance; it happened in the evening.

Doctor *T. Dean* proved as follows:

I was called to see Mr *Bolton* about the 3d or 4th of February. I found him sitting in his wagon; had not been removed; complained of very severe pains; directed him to be removed up stairs at *Henzey's;* found difficulty in getting him out of the wagon; found a fracture of the neck of the thigh bone; considered a difficult case; he was considerably bruised and complained of pain in the back; continued to visit him until the 1st of March following, I then ceased to make entries in my book; the bones were replaced; the apparatus had to be removed, owing to severe pain he complained of in the leg and back; severe constitutional diseases followed; high fever, pain in the head and inflammation of the kidneys; he had been subject to a chronic disease of the kidneys before. It has been a question whether a fracture in that part will ever unite, now settled that it may. He is now lame, and I think it probable he may continue to be a cripple through life [this testimony objected to by defendants' counsel—admitted and point reserved]. He will be subject to pain from changes of weather, this is the case in all fractures; it was necessary to administer large doses of opium to allay the pain. Mr *Bolton* was a very impatient man; I have an indistinct recollection of his discharging bloody urine. I think 60 dollars a moderate compensation for my services; he was a troublesome patient, sent for me often when not necessary, and often in the night time.

It is my opinion that a fracture of this bone may unite; I think in this case it has united; lameness is not a necessary consequence of a fracture of this kind; I have not seen Mr *Bolton* since I ceased to attend him; I observe he halts a little in his gait at present.

I have made an examination of Mr *Bolton's* leg this morning, and find it shortened by accurate measurement three fourths of an inch; the calf of the leg appears more swollen than the sound one.

The plaintiff then gave further evidence of these facts and closed.

The defendants then called *Philip Ressel,* the driver, who testified as follows.

I was the driver of the stage on that day from Hummelstown to Harrisburg; I stopped at *Kuhn's* to water; *Bolton* drove by; I then started and came up with him; when I came within thirty or forty

2 v

yards of him he looked back, he then kept on, and I went on at a regular gait until I got within fifteen or twenty yards of him, he then looked back a second time, gave his horse the whip, and run him the canter, still in the middle of the road; I turned out to the left, thought to pass him on the left, and let him have the middle of the road; when I got up fornent his wagon, he turned out of the middle of the road to the left side, to prevent me from passing; I was then obliged to pull the front horses' reins so as to turn them to the right, to pass him to the right; the hind wheel being in a rut slid along, and caught the tire of the hind wheel of the wagon and turned it over; the wagon turning over frightened my horses, and I could not check them until I got on the face of the hill, and was then obliged to go on to the top of the hill before I could stop. It happened at the foot of a hill. I then stopped, and told the passengers to go back and see whether the man was hurt; such an accident had never happened before; they went back, took him out of the wagon, and set it up. I could have passed to the left of Mr *Bolton* without any injury, if he had not turned in on me; the front wheels of the stage passed free of the wagon, may be two feet; just before the stage struck the wagon his horse made a kind of a halt. It was two hundred, or two hundred and fifty yards from the place where the wagon was upset to where I stopped the stage. I could not stop the horses on the hill with safety to the passengers. I did not hear the passengers call to me to stop.

I was employed by *Colder* and *Wilson*; I generally carry a horn; *Bolton* was in the middle of the road; there was as much room on the one side as on the other; when I found he was passing to the left, I bore up my horses as soon as I could. When I came to town I told Mr *Colder* of the accident; he told me I ought to go and see *Bolton*. I did not go. The passengers told me the same evening they thought his leg was broken. I told the manner it happened to Mr *Puffington* the same evening.

The defendants gave also some evidence of a special custom to regulate the passing of carriages on turnpike roads, &c. : when his honour summed up the evidence in pointed terms in favour of the plaintiff; and the jury found for the plaintiff 1200 dollars damages.

On appeal to the supreme court in bank, the cause was argued for the plaintiff, by *Fisher* and *Krause*; and for the defendants, by *Weidman* and *Norris*.

The opinion of the Court was delivered by

GIBSON, C. J.—Among the reasons assigned for a new trial, there is but one which deserves to be noticed; and there is so little even in it, that were it not necessary to correct an apparent misapprehension on the subject of it, and in a matter of very general concern, it would not be made a subject of remark. The movement of carriages passing on our turnpike roads in *opposite* directions, is regulated by

[Bolton v. Colder and Wilson.]

special enactment; but there is no positive law to regulate the passing of those who are travelling in the *same* direction. The defendants gave evidence of its being a custom in the latter case, for the leading carriage to incline to the right, the other making the transit at the same time by the left; whence it was attempted to be shown, that the injury suffered by the plaintiff, had been occasioned by his own neglect of this custom, which was said to have acquired the consistence of a law, but which was very properly exploded by the court. Nothing should be more pertinaciously resisted, than these attempts to transfer the functions of the judge from the bench to the witness's stand, by evidence of customs in derogation of the general law, that would involve the responsibilities of the parties in rules, whose existence, perhaps, they had no reason to suspect before they came to be applied to their rights. If the existence of a law be so obscure, as to be known to the constitutional expositors of it only through the evidence of witnesses, it is no extravagant assumption to take for granted, that the party to be affected was ignorant of it at the time when the knowledge of it would have been most material to him; and to try a man's actions by a rule with which he had not an opportunity to become acquainted beforehand, is the very worst species of tyranny. The probability of actual ignorance in respect to this particular custom, is greater than in respect to almost any other that can be imagined, as the traveller might reasonably suppose the whole law of the road to be comprised in the statutory admonition that meets the eye at every gate and bridge. The use of parol proof has been, to say the least, sufficiently extended by suffering it to control the private written laws which individuals establish between themselves for the regulation of their rights in particular transactions, without suffering it to control the general law of the land. The judge, therefore, did a valuable service to the stability of the law, by freeing the cause from a matter so entirely foreign to it. It remains, therefore, to be seen, whether the rule laid down by him is founded in the principles of justice and reason. It was not pretended that the mail coaches are entitled to precedence, or the enjoyment of any particular privileges. They are indeed protected by an act of congress from being wilfully and wantonly obstructed or delayed; but in every other respect they are on a footing with all other carriages; and it is right, perhaps, that it should be so. Experience proves, that the drivers of them are not the most eligible depositories of power; and there are few who have not to do with them, either as passengers or travellers. The public, consequently, has an important interest in having them, in common with the drivers of other carriages, held strictly to the measure of their rights; and this can be done only by making their employers sureties for their good conduct as far as the law permits, and liable for their acts. They are seldom of sufficient estate to respond in damages to any considerable extent; and to treat them as exclusively liable, would in most instances be a denial of redress. With these consid-

[Bolton v. Colder and Wilson.]

erations in view, the judge stated the law to be, that a traveller may use the middle, or either side of the road at his pleasure, and without being bound to turn aside for another travelling in the same direction, provided there be convenient room to pass on the one hand, or on the other : and why should it be otherwise ? The law to regulate the deflection of those who are travelling in opposite directions, was designed for the specific case mentioned in it ; the object being, to avoid, by a preconcerted movement, the collision which might otherwise ensue from the mutual misapprehension of intention, frequently observable between foot passengers. But this uncertainty is productive of no collision between carriages travelling in the same direction, and the principle of the enactment is, therefore, not to be extended to it. It is certainly but reasonable, that the traveller, to be accommodated, should be at the pains to give his carriage the proper direction to enable him to profit by his superior speed ; and if there be convenient room to pass on any particular part of the road, he ought not to complain. If there be not, it is doubtless the duty of the other to afford it, on request made, by yielding him an equal share of the road, if that be adequate and practicable ; if not, the object must be deferred till the parties arrive at ground more favourable to its accomplishment. Should the leading traveller refuse to comply, he would be answerable for it. But to effect the passage by a forcible collision with him, is not to be justified, redress being demandable only by due course of law. Conformably to this, it was impossible to doubt that the injury entitled the plaintiff to his action ; and as it clearly appeared to have been the effect of negligence, the verdict was properly rendered for such damages as will probably induce the proprietors of mail coaches to take care that their drivers be more attentive to the rights of others for the future.

　　Judgment affirmed.