THE SYDNEY.[1]

THE WORDEN.

PROVIDENCE WASHINGTON INS. Co. and another *v.* THE SYDNEY and another.

(*Circuit Court, S. D. New York.* March 17, 1886.)

1. MARINE INSURANCE—RUNNING POLICY—CERTIFICATE UNDER AND SUBJECT TO THE CONDITIONS THEREOF—"FOR WHOM IT MAY CONCERN"—CONSTRUCTION OF.

The libelants issued a running policy to H. M. & Co., "on account of H. M. & Co., for whom it may concern." They subsequently, upon the application of H. M. & Co., issued a certificate of insurance under and subject to the conditions of the said policy; loss, if any, payable to the assured, or order. H. M. & Co., by whom the insurance was effected, were intermediaries between boatmen and shippers. A., P. & Co. were the owners of the cargo. The certificate by which the cargo was insured, under and subject to the conditions of the running policy, was obtained by H. M. & Co. at the request of A., P. & Co. The libelants' dealings were entirely with H. M. & Co. In consequence of negligence on the part of the carrier, a total loss ensued. The libelants, upon an abandonment by A., P. & Co. and H. M. & Co. of their interests in the property, paid the insurance in full, and filed a libel against the carrier for negligence. *Held*, that the certificate and policy are to be read together; and when so read, constitute a contract to insure H. M. & Co. for themselves, and for those whom they might represent, having insurable interests in the premises, and that both H. M. & Co. and A., P. & Co. were embraced therein. The intention of the person who effects the insurance, whether known to the insurer or not, determines the application of the clause.

2. SAME—RIGHT OF INSURERS CLAIMING BY SUBROGATION TO SUE FOR NEGLIGENCE—PAYMENT TO THE ASSURED A PREREQUISITE.

Payment of a total loss works an equitable assignment of the property, and the insurer may, after payment to the assured, charge the carrier for negligence in destroying property which has become his. The insurer, upon subrogation to the rights of the assured, becomes the real party in interest, and may maintain the suit in his own name.

3. SAME—NEGLIGENCE—PRESUMPTION—BURDEN OF PROOF.

When a loss occurs in consequence of an explosion of the boiler, a presumption of negligence on the part of the carrier is thereby created, which those who are responsible must rebut by proof of due care, or by showing the existence of circumstances over which they had no control, and to which the result may be fairly attributable.

4. SAME—ADMISSIONS IN ANSWER—PRACTICE—ADMISSION OF FURTHER TESTIMONY AFTER HEARING.

Although the answer denies negligence, it admits facts which raise a presumption of negligence, but as the apostles indicate that the question of neg-

---

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

ligence has not been fully entered into, and as the claimant has relied upon the theory that the facts found did not make out a *prima facie* case against him, he may be permitted to apply for leave to introduce further evidence in this regard.

In Admiralty.
*Edward D. McCarthy*, for appellants.
*Hyland & Zabriskie*, for claimant.

WALLACE, J. The libel in this cause avers, in substance, that the libelants, insurance corporations engaged in the business of marine insurance, did by a policy of insurance agree to indemnify Armour, Plankinton & Co., the owners of a certain cargo of wheat on board the canal-boat Worden, upon a voyage from Buffalo to New York, against the usual marine risks and perils of the voyage; that there was a total loss of the cargo upon the voyage, and an abandonment by the owners to the libelants; that the canal-boat Worden, upon the voyage, was fastened to the steam canal-boat Sydney, and was entirely dependent on the Sydney for motive power; that both the Worden and the Sydney were owned by the same persons; that the loss occurred by the negligence of the persons in charge of the two boats, in consequence of which the Worden was driven upon the rocks of Esopus island, in the Hudson river, and sank; that the libelants became liable to the owners of the cargo in the sum of $9,211.75 as for a total loss, and paid that sum to them as the insurance upon said cargo, whereby libelants became subrogated to the owner's cause of action against the vessels. The answer of the claimant admits that he was the owner of both vessels; denies that the libelants insured the owners of the cargo of the Worden; alleges that the policy insured the claimant as carrier of the cargo; denies all averments of negligence; admits that the Worden, while being towed by the Sydney, and while entirely under the control and management of the Sydney, struck the rocks upon Esopus island, and sunk; admits that these were well-known rocks, easily avoidable ordinarily by tow-boats and their tows; and avers that the Worden foundered by reason of the bursting of the boiler of the Sydney, whereby that steamer was unable to control her movements, and was carried by the tide and wind until the Worden struck the rocks. The answer further alleges that the claimant paid the premium to the libelants for the insurance, upon the agreement that the payment of any loss or damage to the cargo *in transitu* should accrue to the benefit of the claimant, and relieve him from his liability for such loss as a common carrier.

The district court dismissed the libel, and upon this appeal by the libelants the following facts are found:

(1) Prior to the seventeenth day of May, 1883, the libelants issued and delivered to the firm of H. Morse & Co. of Buffalo, New York, a policy of insurance, reciting that "on account of H. Morse & Co., for whom it may concern, they do insure the several persons whose names are hereafter indorsed

on the policy as owner, advancer, or common carrier of goods, merchandise, or produce on his own boat, or boats belonging to others, loaded on commission or chartered, from place to place as indorsed hereon, or in a book kept for that purpose, for the several amounts at the rate and on the goods, merchandise, or produce as specified in the indorsement, beginning the adventure upon the goods, merchandise, or produce from and immediately following the landing thereof at the port or place of the indorsement, and, continuing the same until the goods, merchandise, or produce shall be safely landed at the port of destination." The policy, among other things, excepted from the risk all losses arising from want of ordinary care and skill in lading or navigating the boats.

(2) On the seventeenth day of May, 1883, Morse & Co. applied to the agent of the libelants at Buffalo for insurance upon a cargo of wheat, to be carried on board the canal-boat William Worden from Buffalo to New York, and requested the loss, if any, to be made payable to Morse & Co., or order. Thereupon the agent of the libelants entered in the book a memorandum designating Morse & Co. as the persons on whose account insurance was effected, describing the boat, cargo, and voyage, and specifying the amount insured upon the cargo on the voyage, from Buffalo to New York, as $9,875, and the premium as $14.82. At the same time the agents of the libelants delivered to Morse & Co. a certificate certifying that Morse & Co. were insured under and subject to the conditions of the policy before mentioned, in the sum of $9,875 on cargo of wheat on board boat William Worden from Buffalo to New York, loss, if any, payable to assured, or order.

(3) At the time when the foregoing policy and certificates were executed and issued by the libelants, Morse & Co. were doing business at Buffalo as intermediaries between boatmen and shippers of cargo in procuring cargoes to be shipped for a commission. They were applied to by the owner of the canal-boat Worden to procure him a cargo for New York. They thereupon applied to one Meadows, who was an agent for Armour, Plankinton & Co. for a cargo, and agreed with him to transport 7,900 bushels of wheat from Buffalo to New York on the boat Worden, and to insure the same for a freight of five cents per bushel. Thereupon they entered into a contract with the owner of the Worden, evidenced by a bill of lading, in which they were described as shippers of the cargo for transportation of the cargo to New York, and procured the certificate of insurance aforesaid, and indorsed and delivered to the agent for Armour, Plankinton & Co., and at the same time entered into a contract with him for the transportation of the cargo to New York, evidenced by a bill of lading in which they described themselves as carriers, and Armour, Plankinton & Co. as shippers.

(4) At the time Morse & Co. executed and delived the bill of lading to the agent of Armour, Plankinton & Co. the claimant, as master of the Worden, also executed a duplicate bill of lading, describing himself as carrier, and delivered it to said agent.

(5) By the agreement for the transportation of the cargo between Morse & Co. and the claimant, the latter was to receive five cents per bushel as freight, less the amount to be paid as premium for insuring the cargo, and less a commission of 5 per cent. upon the whole freight money to Morse & Co.

(6) Morse & Co. advanced to the agent of Armour, Plankinton & Co. $200 for prior advances made by the agent upon the wheat, and by the bills of lading the cargo was to be delivered upon payment of this advance and the freight.

(7) At the time of making application for the insurance, receiving the certificate, and signing the several bills of lading, it was understood between Morse & Co. and the claimant that the latter owned the Worden and the Sydney, and intended to tow the Worden by the Sydney on the voyage.

(8) Upon the voyage the Worden was wholly under the control of the Sydney, and both boats were navigated as one vessel practically; and on the twenty-eighth day of May, 1883, while proceeding on the voyage down the Hudson river the Worden struck the rocks on Esopus island, and sunk, and her cargo was damaged to the amount of $6,175.89. These were well known rocks, easily avoidable by vessels.

(9) There is no evidence of any negligence on the part of those in charge of the navigation of the Worden or the Sydney, except such as appears from admissions in the answer of the claimant.

(10) June 26, 1883, the libelants paid to Armour, Plankinton & Co. the sum of $9,211.75 on account of the loss of the cargo insured; and upon an abandonment by the owners to the libelants, and about the same time, they paid to Morse & Co. the sum of $520, in full for their interest in the cargo.

It is to be observed that the cause of action upon which the libel proceeds is for negligence. It is not claimed that the vessels, or either of them, are liable because of a breach of the carrier's contract. The libelants assert that they have succeeded to the rights of Armour, Plankinton & Co., as the owners of the cargo of the Worden, to recover against both boats because of loss sustained by reason of the negligent navigation of the boats. There is no allegation in the libel that the libelants have succeeded to the rights of Armour, Plankinton & Co. by an assignment of the cause of action. The libelants rely purely upon subrogation. The case consequently presents two questions: *First*, whether upon the facts a cause of action existed in favor of Armour, Plankinton & Co. against one or both of the vessels at the time of the payment to them of the loss by the libelants; and, *second*, whether the libelants stand by subrogation in the place of Armour, Plankinton & Co. to enforce that cause of action. If Armour, Plankinton & Co. were not entitled to the insurance, as between themselves and the libelants, under the policy and certificate, the libelants cannot recover.

Treating the case as though Armour, Plankinton & Co. were libelants, their right to recover against the vessels would not be affected by the fact that they had been paid the full amount of their loss by the insurers. *The Monticello*, 17 How. 152. If the insured owner has accepted payment from the insurer, the latter may use the name of the assured to obtain redress from the persons whose conduct caused the loss. At law, the insurer, upon subrogation to the rights of the assured by payment of the loss, can only maintain such a suit in the name of the assured. *Gales* v. *Hailman*, 11 Pa. St. 515; *Hart* v. *Western R. Co.*, 13 Metc. 99; *Hall* v. *Railroad Cos.*, 13 Wall. 367; *Mercantile Ins. Co.* v. *Calebs*, 20 N. Y. 173. In admiralty, however, there seems to be no reason why the insurer may not, as in equity, maintain the suit in his own name as the real party in interest. *Fretz* v. *Bull*, 12 How. 466; *The Monticello* v. *Morrison*, 17 How. 155. As the libelants have paid Morse & Co. for their interest in the loss all the parties whose rights are involved are before the court.

Although the answer denies negligence in the navigation of the

vessels, it admits facts which raise a presumption of negligence. It admits that the Worden, while upon her voyage on the Hudson river, was propelled against well known rocks, and alleges, in exculpation, that this took place because the vessel became unmanageable in consequence of the bursting of the boiler of the Sydney. As both the vessels were navigated as one, and were owned by the claimant, the case is to be treated as though the libel were filed against the Sydney alone, and as though a vessel, having the power to move or stop at pleasure in a channel of sufficient breadth, were charged with negligence by reason of being brought into collision with a well-known obstruction easily avoidable by those in charge. In the absence of any explanatory evidence to indicate that the accident was one which could not be foreseen or prevented by the exercise of proper nautical skill, the facts admitted establish a *prima facie* case of negligence. *The Granite State,* 3 Wall. 310; *Orient Ins. Co.* v. *The Saunders,* 25 Fed. Rep. 727. No evidence has been offered in support of the exculpatory allegations of the answer. Even had it been shown that the accident was occasioned by the explosion of the boiler, and that, after such explosion, the Worden could not have been saved from being driven with such violence upon the rocks as to sink her, it would still have been incumbent upon the claimant to show that the boiler was in a safe condition, and was properly managed. Boilers do not usually explode when they are in a safe condition and are prudently managed, and the fact of an explosion therefore creates a presumption of negligence, which those who are responsible for the consequences must overthrow by evidence showing due care, or the existence of circumstances over which they have no control, to which the result may be fairly attributed. *Transportation Co.* v. *Downer,* 11 Wall. 129; *The New World* v. *King,* 16 How. 477; *Rintoul* v. *New York Cent. & H. R. R. Co.,* 21 Blatchf. 439; S. C. 17 Fed. Rep. 905; *Mullen* v. *St. John,* 57 N. Y. 567. In the case of *Rose* v. *Stevens & Condit Transp. Co.* it was held in this court that negligence may be inferred from the fact of the explosion of a steam-boiler on a vessel, even where the defendant is under no contract obligation to the plaintiff. 20 Blatchf. 411, and 11 Fed. Rep. 438. It follows that a sufficient case was shown to authorize a recovery by the owner of the cargo against the vessels.

Assuming that Armour, Plankinton & Co. could recover upon the proofs if they were libelants, it remains to consider whether the libelants became subrogated to their cause of action. The rule is elementary that payment of a total loss by the insurer works an equitable assignment to him of the property and all the remedies which the insured had against the others for the loss. The question is, then, whether Armour, Plankinton & Co. were insured to the extent of their interest as owners of the cargo, under the policy and certificate issued by the libelants to Morse & Co.

The contract of insurance is found in the policy and certificate, supplemented by such extrinsic evidence as may be properly received to explain but not to contradict their terms. The policy is a running or floating policy, intended to cover future shipments of goods or produce. Its phraseology respecting the persons and interests to be insured is somewhat equivocal, owing doubtless to the fact that the words "on account of H. Morse & Co. for whom it may concern," were written into the printed form adapted to insure all persons who might become parties to it by indorsing their names thereon. By its terms, the voyage, the amount to be insured, the property, and the rate of premium are to be described by an indorsement upon the policy or in a book kept for that purpose; such indorsement to be approved, and signed by the libelants. It is to be read as though the libelants undertook to insure Morse & Co. for themselves and those whom they might represent in procuring insurance, and also undertook, at the request of Morse & Co. to insure any other persons having an interest as owners, advancers, or common carriers whose names and interests should thereafter be indorsed upon the policy. When the names of Morse & Co. were inserted in it, it was appropriate to meet the different classes of transactions which an insurance by them might represent. It was such as would enable them to effect an insurance in their own name when they had any interest in the risk as advancers or carriers, or to obtain insurance for the owner, advancer, or carrier, and in his name, if they desired or had no interest themselves. Upon the correct construction, insurance effected in the name of Morse & Co. was to inure to the benefit of all concerned,—that is, for the benefit of all for whom they acted in obtaining insurance; and when insurance was not effected in the name of Morse & Co. the name of the person to be insured, with a statement of his interest, was to be indorsed on the policy, and he would thereby become the assured. Upon any other construction the words "for whom it may concern" are nugatory. Insurance in the name of another might sometime be desirable when Morse & Co. had no interest in the transaction other than that of agent for procuring cargoes, and insurance upon them, for others for a commission.

No indorsement was made upon the policy of the name of the person insured; but upon the application for the insurance the memorandum of the property, the voyage, the amount of insurance, and the rate were entered by the libelants in the book kept for that purpose as recited in the certificate delivered by them to Morse & Co. The certificate and policy are to be read together, and, so read, form a contract between the libelants and Morse & Co. to insure the latter "for whom it may concern." This was an insurance for Armour, Plankinton & Co. to the extent of their interests as owners of the cargo, because the proofs show indisputably that Morse & Co. obtained the insurance at the request and for the protection of Armour,

Plankinton & Co. It was also an insurance for the benefit of Morse & Co. to the extent of their interests as carriers and for advances.

Although the general rule is that, if a policy insures the interest only of the person named in it, no other person can show that it was also intended to cover his interest, it is otherwise if the policy contains the phrase "for whom it may concern;" and under such a policy the intention of the person who effects the insurance determines the application of the clause. The insurance effected by him insures all who have an insurable interest in the property to the extent of their interests, where there is previous authority or subsequent ratification of an insurance obtained for them. This is so whether the intention of the person effecting the insurance is known to the insurer or not; and the persons whose interests are thus insured may sue upon the policy in their own name, and a recovery by one inures to the benefit of all, and bars a recovery by the others. The phrase ordinarily applies, however, only to those who are contemplated at the time of the insurance, and who then had an insurable interest in the subject-matter. 1 Pars. Ins. 45; *Hopper* v. *Robinson*, 98 U. S. 528; *Henshaw* v. *Mutual Safety Ins. Co.*, 2 Blatchf. 99; *Hermann* v. *Louisiana State Ins. Co.*, 7 La. 502; *Duncan* v. *Sun Ins. Co.*, 12 La. Ann. 486; *Buck* v. *Chesapeake Ins. Co.*, 1 Pet. 151; *Rogers* v. *Traders' Ins. Co.*, 6 Paige, 583.

It is not apparent how the libelants, after payment of the loss to Armour, Plankinton & Co. maintained any different position, in respect to their rights to recover against the vessel, than would have been occupied by Armour, Plankinton & Co. if the suit had been brought by them before payment of the loss. The libelants did not, by paying the loss, admit, in favor of the claimant, that the loss was one within the risk of the policy, and therefore not within one of the accepted risks as a loss arising from the want of ordinary care in navigating the boat. They were obliged to pay the loss to Armour, Plankinton & Co. before they could assert any claim against him. When they paid it, they became Armour, Plankinton & Co. for the purposes of enforcing the cause of action. They would doubtless be precluded from maintaining an action against Armour, Plankinton & Co. to recover back the payment unless they could show fraud or mistake. But it is impossible to see how this circumstance can prejudice them in an action against a third person. Moreover, if the payment should be treated as an admission on the part of the libelants of their understanding, at the time, that the loss was one within the terms of the policy, and did not arise from an accepted risk, nevertheless the evidence now is that the loss arose by reason of the negligence of those in charge of the vessels.

The decision in the court below, as appears by the opinion of the learned district judge, was placed upon the ground that the insurance effected by Morse & Co. was an insurance for themselves only; but, if otherwise, was intended by them to cover the insurable interest of

the claimant in the cargo as a carrier; that the insurance therefore inured to the claimant's benefit as well as to that of Morse & Co. and Armour, Plankinton & Co., and protected him to the extent of his liability as carrier for the delivery of the cargo to the owner; and that payment to the owner was, in legal effect, payment to him, and concluded the insurers from maintaining the suit without affirmative allegations and proof that the payment was made upon a mistake of facts.

If Morse & Co. were the only parties insured, the libel was properly dismissed, if for no other reason, because it does not proceed upon the theory that the libelants have succeeded to any rights by subrogation except to those of Armour, Plankinton & Co. But the conclusion that Morse & Co. were the only parties to the contract can only be reached by refusing to give any effect to the phrase in the policy "for whom it may concern." That phrase is meaningless if it does not mean that an insurance effected in their names is to extend to all for whom they are authorized to insure. If the policy were to be interpreted as intended to insure only those persons whose names and interests should be indorsed upon it, then it would read as though the phrase "on account of Morse & Co., for whom it may concern," were altogether omitted. With the phrase inserted, it is unnecessary to indorse the name subsequently upon the policy, but all become parties, "for whom it may concern," to any insurance which may be effected upon their application. Upon any other construction of the policy it would have been useless to insert the name of Morse & Co. in the policy at all.

If the libelants were attempting to enforce a cause of action against the claimant for a breach of his obligations as a carrier, and if they had insured him as carrier, as well as Morse & Co. and Armour, Plankinton & Co., it would seem very clear that they could not succeed. In such a case they would be attempting to reclaim moneys which they had agreed to appropriate in part for his indemnity against the very loss which had arisen,—a fund which became his to an extent commensurate with his obligations as a carrier as soon as the loss took place. But they do not seek to recover back money which they have paid him, or paid to some one else in part for him, in discharge of their contract of indemnity. They seek to charge him for negligence in destroying the property which has become theirs by an equitable assignment from the owner.

The proofs do not show that the interest of the carrier was intended to be insured by Morse & Co. when they applied for the insurance and procured the certificate. If, as was thought to be the fact by the district judge, the premium was paid for the insurance by the claimant, that circumstance would be quite controlling to indicate an understanding between Morse and himself that his interest should be protected by the insurance. The evidence is that he agreed, through Morse & Co., with the agent of Armour, Plankinton

& Co., to pay the premium as a part of the consideration of the contract for transportation. In other words, he agreed for $395 to transport the cargo to New York, and pay the premium for insurance. He paid it out of the $395 received from Morse and Co., and in no other way. The owners paid the premium when Morse & Co. were paid by them.

Considerable evidence was elicited from the witnesses for the purpose of showing usage among shippers, insurers, and boatmen, at Buffalo, to the effect that insurance procured under circumstances similar to those in this case is understood to protect the carrier as well as all other persons interested in the safe transportation of the cargo. The evidence falls short of establishing such a usage. It is loose, conflicting, conjectural, and equivocal. See *Donnell* v. *Columbian Ins. Co.*, 2 Sum. 366; *The Eddy*, 5 Wall. 481; *Bolton* v. *Colder*, 1 Watts, 360; *U. S.* v. *Buchanan*, 8 How. 83, 102. So far as this evidence tends to show that Morse & Co., when they procured the insurance, intended to obtain it for the benefit of the carrier as well as for the owners and themselves, it is legitimate; but it is not persuasive in view of the fact that the insurance was procured at the request of the owners, and as a condition of the contract for transportation, and the further fact that there was no conversation between Morse & Co. and the master of the Worden.

Those considerations lead to a reversal of the decree of the district court. The apostles indicate that the question whether the claimant was guilty of negligence in the navigation of the boats has not been fully litigated, and that the claimant has mistakenly relied upon the theory that the facts proved did not make out a *prima facie* case against him. It is therefore deemed proper to permit the claimant to apply for leave to introduce further evidence upon the question whether the loss arose from the want of ordinary care and skill in the navigation of the boats. Unless such an application is made within 20 days a decree will be entered for the libelants in the sum of $6,175.89, with interest from May 28, 1883, with costs in this court and in the district court.