## GLOBE & RUTGERS FIRE INS. CO. v. HINES, Agent.

(Circuit Court of Appeals, Second Circuit. May 19, 1921.)

No. 212.

1. **Insurance ☞606(3)—Marine underwriter is subrogated by law to rights of insured in regard to loss.**

An underwriter of marine insurance, who had paid the loss resulting from a collision between the insured vessel and another, is subrogated by operation of law to the rights of the insured owner of the vessel against the other vessel in regard to the loss, and no assignment of such rights is necessary.

2. **Insurance ☞606(3)—Marine underwriter has no greater rights than insured to recover for loss.**

The underwriter of marine insurance stands in no better position than the insured, and cannot recover against third persons for the loss sustained, unless the insured could have recovered.

3. **Insurance ☞606(3)—Underwriter can claim no subrogation, if both vessels in collision have same owner.**

There can be no right of subrogation in favor of a marine insurance underwriter for loss paid on a ship injured by collision, if the ship which was injured and that which committed the injury are owned by the same party.

4. **Subrogation ☞33(2)—Surety gets no rights by subrogation greater than rights of principal.**

It is a general principle in the law of subrogation that a surety paying off a debt can acquire no greater rights than the creditor had at the time of payment.

5. **Action ☞15—Same person cannot be plaintiff and defendant, though acting in different capacities.**

The same person cannot be both plaintiff and defendant at the same time in the same action even though he appears in different capacities.

6. **Parties ☞1—Jurisdiction of court depends on party to record, not on beneficial parties.**

The jurisdiction of the court over the parties depends on the character of the parties to the record, and not on those who may have an equitable interest in the suit.

7. **Railroads ☞5½, New, vol. 6A Key-No. Series—Federal control created single system.**

The Director General of Railroads, while operating the railroads under federal control assumed by the President under Act Aug 29, 1916, and the Federal Control Act of March 21, 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p), operated the railroads as a single national system of transportation under a unified head or control, and not as separate companies or systems.

8. **Railroads ☞5½, New, vol. 6A Key-No. Series—Provision of Federal Control Act for suits nullified by executive order.**

The provision of the Federal Railroad Control Act of March 21, 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p), that

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

actions at law or suits in equity might be brought against such carriers, except in so far as might be inconsistent with the provisions of the act or the orders of the President, was nullified by the order of the Director General, which was in effect the order of the President, requiring actions and suits to be brought against the Director General, and not against the carriers.

9. **Railroads ⊂⇒5½, New, vol. 6A Key-No. Series—Director General represented government, and not companies.**

While the railroads were under federal control, the Director General of Railroads represented the United States, and was the carrier against whom suits might be brought, under the Federal Control Act of March 21, 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p).

10. **Railroads ⊂⇒5½, New, vol. 6A Key-No. Series—Director General not entitled to recover for injuries to railroad barge, inflicted by another railroad's barge.**

Since the Director General of Railroads operated all railroads as the instrumentality of the federal government, and not as the representative of the railroad companies, though it was the practice to refer to him as the Director General operating a specific railroad, he could not recover in admiralty for injuries to a barge owned by one railroad company and operated by him, occasioned by the negligence of another barge owned by a different company and also operated by him, and therefore the insurer of the injured barge is not subrogated to any right to recover against the barge inflicting the injury.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Globe & Rutgers Fire Insurance Company against Walker D. Hines, as Agent of the United States Railroad Administration. Decree for respondent, and libelant appeals. Affirmed.

Macklin, Brown, Purdy & Van Wyck, of New York City (Pierre M. Brown, of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (Leonard J. Matteson, of New York City, of counsel), for appellee.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Homer H. Breland, both of New York City, of counsel), for Pennsylvania R. Co.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge. This is a suit in admiralty, brought by the libelant, as insurer of the Central Railroad Company of New Jersey float No. 47, and on behalf of the owner and operator of said float, against Walker D. Hines, as agent of the United States Railroad Administration, operator of the New York Central steam tug No. 27 in a cause of collision, civil and maritime.

The libel alleges that libelant insured the United States Railroad Administration, as operator of the Central Railroad Company of New Jersey float No. 47 against loss or damage, that it has paid the loss for which it was liable as such insurer, has become subrogated to the rights of the owner and operator of the float arising out of the collision which occasioned the loss insured against, and that the action is brought on behalf of itself as such insurer and on behalf of the owner and operator of float No. 47, and it is alleged in the libel that on August

24, 1918, a collision occurred between float No. 47 and the New York Central Railroad's steam tug No. 27, off the Battery in the East River, and that at that time the railroad and its equipment, together with the steam tug No. 27, were maintained, operated, and controlled by the United States Railroad Administration, and that respondent Hines was the agent of the said Administration, having been duly appointed as such by the President of the United States pursuant to the acts of Congress. The libel also sets forth the circumstances of the collision, and that the collision and the resulting damage were not caused by any negligence on the libelant's part, or on the part of those in charge of float No. 47, but were caused through the negligence of the New York Central tug No. 27.

The respondent, as the agent duly appointed under the Transportation Act of February 28, 1920 (41 Stat. 456), against whom suits may be brought for matters arising out of the operation and control of the various railroads by the United States Railroad Administration, duly appeared and excepted to the libel on two grounds. The substance of the first is that the cause of action, if any, which arose out of the collision, can only be against the Railroad Administration (otherwise, the Director General of Railroads), and that, as libelant's assured was the Railroad Administration itself, no cause of action accrued to libelant's assured, inasmuch as there could be no right of action by the United States Railroad Administration against itself, and that for this reason, no cause of action having ever accrued to libelant's assured, the libelant could take by subrogation no greater rights than its assured possessed, and is therefore no more able in its own name to sue the United States Railroad Administration than the Railroad Administration would be able to sue itself.

The libelant also claims to recover on behalf of its assured the portion of the damage sustained by reason of this collision which was not covered by the insurance. The second exception is based on the fact that libelant is not entitled to sue on behalf of its assured for those items, and further that the reasoning under the first exception applies with equal force to any claim set up on behalf of the Railroad Administration against itself.

The court below, after argument, sustained the exceptions and dismissed the libel.

[1] It is, of course, conceded that an underwriter of marine insurance, by payment of a loss, becomes by operation of law and without assignment subrogated to all the rights of the insured in regard to that loss. Phœnix Insurance Co. v. Erie Transportation Co., 117 U. S. 312, 320, 321, 6 Sup. Ct. 750, 29 L. Ed. 873; Kaltenbach v. Mackenzie, 4 Aspin. 39; The Sydney (C. C.) 27 Fed. 119; Hogan v. Manselly, Fed. Cas. No. 6,584. It has even been held that the fact that the underwriter might have successfully resisted payment under the policy does not affect his right to subrogation upon payment of the loss. Nord-Deutscher Lloyd v. Insurance Co. of North America, 110 Fed. 420, 49 C. C. A. 1.

[2] But the general rule is that the underwriter stands in no better position than the insured, and can have no recovery against third persons, except such as could have been had by the insured. Simson v. Thompson, 3 App. Cas. 279, 3 Aspin. 567; The Catskill (D. C.) 95 Fed. 700; The Livingstone (D. C.) 104 Fed. 918. In Joyce on Insurance, vol. 5, § 3538, p. 5883, the rule is correctly stated as follows:

"The insurer stands in no relation of contract or of privity with such persons. His title arises out of the contract of insurance, and is derived from the assured alone, and can only be enforced in the right of the latter. In a court of common law, it can be asserted only in his name; and even in a court of equity or of admiralty it can be asserted only in his right. In any form of remedy, the insurer can take nothing by subrogation but the rights of the assured."

[3] The insurers stand by subrogation in the shoes of the insured, and can claim no more than the insured could claim. It follows that there can be no right of subrogation, if the ship which is injured and the ship which commits the injury are owned by the same party. In Phœnix Insurance Co. v. Erie Transportation Co., supra, the court, speaking through Mr. Justice Gray, said:

"For instance, if two ships, owned by the same persons, came into collision by the fault of master and crew of the one ship and to the injury of the other, an underwriter, who has insured the injured ship, and received an abandonment from the owner, and paid him the amount of insurance as and for a total loss, acquires thereby no right to recover against the other ship, because the assured, the owner of both ships, could not sue himself."

[4] The principle is a general one in the law of subrogation that a surety, paying off a debt, can acquire no greater rights than the creditor had at the time of payment, as the surety cannot be placed in a more favorable condition than the principal. We must therefore start with the proposition that the libelant is not entitled to maintain this suit, if the party insured, declared in the libel to be "the United States Railroad Administration," as operator of the said railroad and said float No. 47 (the Central Railroad Company of New Jersey float No. 47), could not itself maintain a suit against the respondent herein to recover for the injury insured against. If such a suit had been brought, and the right to maintain it had been seasonably challenged, could this court have sustained it? That, as it appears to us, is the question we must determine. If such a suit could not be maintained, the libel was properly dismissed in the court below; otherwise, not.

[5] It is elementary that the same person cannot be both plaintiff and defendant at the same time in the same action. It is incongruous that the same person should direct and conduct both the prosecution and the defense of the same suit, no matter in what capacity he may appear. Swope v. Swope, 173 Ala. 157, 164, 55 South. 418, Ann. Cas. 1914A, 937. And the rule has been applied where the same person sues and defends in different capacities. Thus a town treasurer has been held incapable of maintaining an action in his individual capacity against himself in his official capacity on a claim against the town. Barber v. Barber, 32 R. I. 266, 79 Atl. 482.

[6] And in such cases it is the general rule that the jurisdiction of the court depends upon the character of the party to the record, and the court does not inquire as to who may have an equitable interest in the suit. Sharps' Rifle Manufacturing Co. v. Rowan, 34 Conn. 329, 91 Am. Dec. 728. In Osborn v. Bank of the United States, 9 Wheat. 738, 6 L. Ed. 204, Chief Justice Marshall, referring to the provision of the Constitution giving jurisdiction of the federal courts of controversies between citizens of different states, said:

"Does this provision depend on the character of those whose interest is litigated, or of those who are parties on the record? In a suit, for example, brought by or against an executor, the creditors or legatees of his testator are the persons really concerned in interest; but it has never been suspected that, if the executor be a resident of another state, the jurisdiction of the federal court could be ousted by the fact that the creditors or legatees were citizens of the same state with the opposite party. * * * Why, then, is it universally admitted that this interest in no manner affects the jurisdiction of the court? The plain and obvious answer is because the jurisdiction of the court depends, not upon this interest, but upon the actual party on the record."

In that view of the case it would seem unimportant to inquire in what capacity the Director General sues or is sued, and as to whether he represents the United States, or whether he represents the particular railroad company or companies operating.

It is, however, earnestly urged upon the court that, as between the Railroad Administration and the underwriters, it should be held that during the period of federal control the railroads were operated by the Director General as separate entities, and that courts of equity often recognize a party's dual relationship, and that courts of admiralty, administering equitable principles, are able to differentiate between a party's diverse relationships. Corrigan Transit Co. v. The Majestic (D. C.) 73 Fed. 499, 500. The importance of the question involved leads us to examine the legislation of Congress on the subject of federal control, with the view of ascertaining therefrom the capacity in which the Director General operated the railroads while that control continued.

On December 28, 1917, pursuant to the powers conferred on him by Act Aug. 29, 1916 (39 Stat. 645), the President took possession and assumed control of every system of railroad transportation, and the appurtenances thereof, located within the boundaries of the continental United States. By his proclamation issued on that day he appointed William G. McAdoo Director General of Railroads, and the railroads passed into the possession, use, control, and operation of such Director General from and after 12 o'clock midnight on December 31, 1917. The proclamation, among other things, provided that the Director General might perform the duties imposed upon him, so long and to such extent as he should determine, through the officers and employees of the said systems of transportation. Until the Director General otherwise directed, the officers and employees of the various systems were to continue the operation thereof in the usual and ordinary course of the business of common carriers in the names of their respective companies. The proclamation further provided as follows:

"Except with the prior written assent of said Director no attachment by mesne process or on execution shall be levied on or against any of the

property used by any of said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgments rendered as hitherto until and except so far as said Director may, by general or special orders, otherwise determine." 40 Stat. pt. 2, p. 1733.

Thereafter Congress passed Act March 21, 1918 (40 Stat. p. 451, c. 25 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p]), which further regulated the subject of federal control. Among other provisions was the following:

"Carriers while under federal control shall be subject to all laws and liabilities as common carriers whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government. Nor shall any such carrier be entitled to have transferred to a federal court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the federal control of such carriers; and any action which has heretofore been so transferred because of such federal control or of any act of Congress or official order or proclamation relating thereto shall upon motion of either party be retransferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such federal control." Section 10.

On October 28, 1918, the Director General promulgated General Order No. 50. It reads:

"Whereas, since the Director General assumed control of said systems of transportation, suits are being brought and judgments and decrees rendered against carrier corporations on matters based on causes of action arising during federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits and proceedings hereinafter referred to, based on causes of action arising during or out of federal control should be brought directly against the said Director General of Railroads and not against said corporations:

"It is therefore ordered that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad or system of transportation by the Director General of Railroads, which action, suit, or proceeding but for federal control might have been brought against the carrier company, shall be brought against William G. McAdoo, Director General of Railroads, and not otherwise: Provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties, and forfeitures."

William G. McAdoo having resigned as Director General, the President, on January 10, 1919, pursuant to the powers which had been conferred upon him by law affecting federal control of railroads and systems of transportation, appointed Walker D. Hines as Director General, and authorized him among other things—

"to issue any and all orders which may in any way be found necessary and expedient in connection with federal control of such systems of transportation, railroads, or inland waterways, as fully in all respects as the President is authorized to do, and generally to do and perform all and singular all acts

and things and to exercise all and singular the powers and duties in relation to such federal control as the President is by law empowered to do and perform." 40 Stat. 1922.

On January 11, 1919, Walker D. Hines, as Director General of Railroads, issued General Order No. 50A, which corresponded in all respects with General Order No. 50, except that suits were no longer to be brought against William G. McAdoo, but simply against the director General of Railroads.

The act of February 28, 1920, known as "The Transportation Act, 1920," provided that federal control should terminate on March 1, 1920, and provision was made as to the prosecution of suits. It provided that actions at law, suits in equity, and proceedings in admiralty based on causes of action arising out of the possession, use, or operation by the President of the railroad or system of transportation of any carrier under the federal control, of such character as prior to federal control could have been brought against such carrier, may, after the termination of federal control, be brought against an agent designated by the President for such purpose.

The act giving to the President federal control of the railroads was based upon the war power, and was a legal exercise thereof, as the Supreme Court practically decided in Northern Pacific Ry. Co. v. North Dakota, 250 U. S. 135, 39 Sup. Ct. 502, 63 L. Ed. 897. So was the action of Congress in giving to the President a like control over the telephone and cable lines. Dakota Central Telephone Co. v. State of South Dakota, 250 U. S. 163, 39 Sup. Ct. 507, 63 L. Ed. 910, 4 A. L. R. 1623.

[7] It seems to us that the result of all this was that the railroad properties within the continental United States, while federal control lasted, were organized into a unified national system of transportation under a single head, the Director General of Railroads. As the Supreme Court, speaking through Chief Justice White, in Northern Pacific Ry. Co. v. North Dakota, 250 U. S. 135, 148, 39 Sup. Ct. 502, 505 (63 L. Ed. 897), declared, the Acts of Congress and the President's proclamation thereunder gave "no divided but a complete possession and control" to the United States "for all purposes as to the railroads in question." How, he asked, "can any other conclusion be reached, if consideration be given the comprehensive provisions concerning the administration by the United States of the property which it was authorized to take, the financial obligations under which it came and all the other duties and exactions which the act imposed, contemplating, * * * one power for the accomplishment of the one purpose, the complete possession by governmental authority to replace for the period provided the private ownership theretofore existing?"

The railroads were operated by the Director General as a national system of transportation. To the extent that the former officers and employees of the railroads were retained in their positions, they ceased to act as the agents of their respective corporations, which no longer had any authority over them, but were exclusively the servants of the Director General, and therefore of the government of the United States.

From the time the Director General assumed control of the railroads to the time when his control was relinquished, all the former officers and employees who retained their positions and continued in the operation of the roads became the agents of the Director General, and their acts were his acts. It would have been an anomaly indeed to have given the actual possession and control of the railroads to the Director General, and having divested the railroad corporations of all authority of management or control and of their revenues, and converted their employees into the servants of the Director General, so that their acts became his acts, had, nevertheless, left the corporations liable for the acts of his agents. We do not so understand the acts of Congress or the decisions of the federal courts. Rutherford v. Union Pacific Railroad Co. (D. C.) 254 Fed. 880; Mardis v. Hines (D. C.) 258 Fed. 945; Hatcher & Snyder v. Atchison, Topeka & Santa Fé Railway Co. (D. C.) 258 Fed. 952; Haubert v. Baltimore & Ohio Railroad Co. (D. C.) 259 Fed. 361; Smith v. Babcock & Wilcox (D. C.) 260 Fed. 679; Nash v. Southern Pacific Co. (D. C.) 260 Fed. 280; Westbrook v. Director General of Railroads (D. C.) 263 Fed. 211; Blevins v. Hines (D. C.) 264 Fed. 1005; Erie Railroad Company v. Caldwell (C. C. A.) 264 Fed. 947; Hines v. Dahn (C. C. A.) 267 Fed. 105; Mardis v. Hines (C. C. A.) 267 Fed. 171; Hines v. Smith (C. C. A.) 270 Fed. 132, 135; Ellis v. Atlanta, B. & A. Ry. Co. (D. C.) 270 Fed. 279.

In Hines v. Dahn, supra, the Circuit Court of Appeals for the Eighth Circuit held that "the systems of transportation" and "the carriers" which were taken under federal control by the President's Proclamation of December 26, 1917, were the physical properties of the various railroads, and not the corporations owning and operating them. The court declared that the Director General, in operating a railroad, was the agent of the United States, and not of the railroad company, and that an action brought against him was in legal effect an action against the United States; that, while the action is against the Director General, he is not personally liable, but the government is, and that by the terms of the Federal Control Act it had consented to be sued in causes of action arising out of the possession or operation of the railroads by it.

In Erie Railroad Co. v. Caldwell, supra, the Circuit Court of Appeals for the Sixth Circuit, in holding that no action for negligence could be maintained against a railroad company during the period of federal control, said:

"The trial court should have sustained this motion, and dismissed the Erie Railroad Company from the suit. The Director General of Railroads having lawfully taken full possession and control of this company's property, the company itself could not be held liable for negligence resulting in injury to employees or others during the time its property was being operated by governmental agencies over which it had no control. The decision of the Supreme Court of the United States in the case of Northern Pacific Railroad Co. v. North Dakota, 250 U. S. 135, 39 Sup. Ct. 502, 63 L. Ed. 897, definitely settles and declares the paramount authority of the Director General, and is controlling in this case."

Some courts, it is true, have taken a different view of the act, and held that litigants were authorized by section 10 to sue the companies

as they had theretofore been able to do, and that it was not competent for the Director General to set aside the plain provisions of the statute in that respect. Johnson v. McAdoo (D. C.) 257 Fed. 757, is one of such cases. We think such a construction of the act is based upon a misapprehension of what was intended, and is opposed to the decided weight of authority.

The validity of General Order No. 50, requiring suits to be brought against the Director General of Railroads, and not otherwise, was denied in Lavalle v. Northern Pacific Ry. Co., 143 Minn. 74, 172 N. W. 918, 4 A. L. R. 1659, by a majority of the court. It was held that Order No. 50 was in conflict with section 10 of the Act of March 21, 1918, the court saying:

"In so far as it denied to a plaintiff the right to pursue the railroad company [it] was beyond the power of the Director General and was void."

This the court adhered to in Gowan v. McAdoo, 143 Minn. 227, 234, 173 N. W. 440, and in Palyo v. Northern Pacific Railway Co., 144 Minn. 398, 175 N. W. 687. And the same conclusion was reached in Wisconsin, likewise by a divided court of four to three, in Franke v. Chicago & Northwestern Railway Co., 170 Wis. 71, 173 N. W. 701; the court saying:

"This provision of section 10 of the Federal Control Act and provisions of General Order No. 50 issued by the Director General of Railroads, and upon which the court below based its order, cannot both stand. The legislative declaration is the paramount authority and must control."

The language of section 10 of the act of Congress reads:

"That carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President."

The validity of the President's proclamation and of General Order No. 50 has not been challenged by counsel before this court.

In Postal Telegraph-Cable Co. v. Call, 255 Fed. 850, 167 C. C. A. 178, the Circuit Court of Appeals for the Fifth Circuit understood the effect of the Federal Control Act as simply limiting the interference of government control in the prosecution of suits against carriers, whether at law or in equity, to the enforcement of the judgment or decree, and that it did not interfere with the right of the plaintiff to obtain a judgment or decree against the carriers. The case arose out of an application for a writ of mandamus to compel the District Judge to hear and determine a controversy in which the petitioner was seeking to condemn a right of way. The cause was at issue on April 15, 1918, which was before the Director General had issued General Order No. 50, already referred to, and which was not issued, as we have seen, until October 28, 1918. The court said:

"We think the express words of the statute require the court to proceed to judgment or decree in any pending cause, and to prohibit any defense being made to the obtaining of the judgment or decree upon the idea that the carrier or its property is in government control or possession."

It is also declared, however, that:

"It [the Federal Control Act] permits actions at law or in equity to be brought against the carriers, and judgments to be rendered as now provided by law, and prohibits the carrier from defending upon the ground that it is an instrumentality or agency of the federal government."

General Order No. 50 was not mentioned in the opinion, and it does not appear whether it had at that time come to the knowledge of the court. Order No. 50, however, by its own terms expressly stated that it applied to actions "hereafter brought." As to pending actions and proceedings against any carrier company, the order provided that the pleadings "may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom." The decision in the above case must be understood in the light of the facts before the court. We do not understand it as necessarily in conflict with Hines v. Dahn, supra.

[8] While the act of 1918 expressly provided that actions might be brought by and against carriers, and judgments rendered "as now provided by law," that provision was subsequently nullified by General Order No. 50, if valid, the effect of which order was not passed upon by the court. But the Director General, in issuing General Order No. 50, acted under the authority of the President, and his order was in effect the order of the President, and the provisions of the Federal Control Act on the subject now being considered were declared by that act to be binding only in so far as they were not inconsistent "with any order of the President." And after General Order No. 50 was issued actions were not to be brought against the carrier, but against the Director General.

The Act of March 21, 1918, which provided for taking the railroads under federal control, did not provide for taking under federal control the telegraph and telephone and cable systems of the country. But the Act of July 16, 1918, authorized the President, whenever he deemed it necessary for the national security or defense, to assume control and to operate, for the duration of the war, any telegraph, telephone, marine cable. or radio system or systems. 40 Stat. pt. 1, p. 904, c. 154 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾x). And the President did take these systems into his possession, operation, and control by his proclamation of July 22, 1918. In that proclamation he directed that the possession, operation, and control by him should be exercised by and through the Postmaster General, and that he (the Postmaster General) might perform the duties thus imposed upon him "so long and to such extent and in such manner as he shall determine, through the owners, managers, board of directors, receivers, officers and employees of said telegraph and telephone system." It also contained the following provision:

"Until and except so far as said Postmaster General shall from time to time by general or special orders otherwise provide, the owners, managers, board of directors, receivers, officers and employees of the various telegraph and telephone systems shall continue the operation thereof in the usual and

ordinary course of business, in the names of their respective companies, associations, organizations, owners or managers, as the case may be."

We have seen that in Dakota Central Telephone Co. v. State of South Dakota, supra, the constitutionality of that act was sustained. And in Amerson v. Western Union Telegraph Co. (D. C.) 265 Fed. 909, the court had before it the question whether the Western Union Telegraph Company was liable in damages for the negligent delivery of a message during the time of federal control. It was held that the action could not be maintained; the court saying:

"At the time the cause of action asserted by plaintiff arose, the defendant's entire plant and outfit were in the absolute control of the government of the United States under certain war legislation. It is too much to say that there can be any reasonable doubt that under such circumstances the defendant, which never received nor transmitted the telegram mentioned in the plaintiff's petition, should be responsible for its not being sent or not delivered. Without undertaking to say who would be responsible for the miscarriage of that communication, or for anything else respecting it, it certainly could not be maintained that the defendant is responsible for it."

[9] The only conclusion which we have been able to reach is that the Director General of Railroads represented the United States during the period of federal control, and that whatever liability was incurred during that period because of the negligent operation of the roads was not incurred by the railroad corporations but by the Director General representing the United States. The Director General is the "carrier," and in any action at law, or suit in equity, or proceeding in admiralty it is by virtue of the Act of March 21, 1918, no defense that the carrier was an instrumentality or agency of the federal government.

[10] The fact that in suits of this nature a practice grew up of describing the Director General as operating a certain system or line of road, out of the operation of which the cause of action arose, is without legal significance. It could not affect in any degree his corporate capacity. There was but a single Director General, one corporate entity. The Director General of Railroads operating the New York Central Railroad was the same legal entity as the Director General operating the Central Railroad of New Jersey. The words "operating the Central Railroad of New Jersey" constitute merely a descriptive phrase, adopted by counsel for convenience, and not recognized nor provided for by anything in the acts of Congress or in any proclamation of the President. It is therefore impossible that the Director General of Railroads, operating the Central Railroad Company of New Jersey float No. 47, should be able, under the established rules of legal procedure, to maintain an action at law, or a suit in equity, or a proceeding in admiralty against the Director General operating the New York Central steam tug No. 27. Inasmuch as the libelant stands in the place of its insured, the libel fails to state a cause of action.

Decree affirmed.