Black, J.
Defendant moved to dismiss plaintiff’s complaint at the close of plaintiff’s case. The motion was denied. Defendant then rested on plaintiff’s proof and again moved to dismiss on the whole case. The motion was denied. Plaintiff then moved for a *369 direction of a verdict. Defendant asked to go to the jury. Plaintiff’s motion for a directed verdict was granted and defendant’s motion to go to the jury denied.
Defendant moved to set aside the verdict of the jury, upon which motion decision was reserved.
The plaintiff, a New Jersey corporation authorized to and doing business in New York, seeks to recover the sum of $13,995.80, with interest from May 15, 1928, as insured on a cause of action under a contract of insurance of the defendant insurance corporation organized 'under section 163 et seq. of the New York Insurance Law. The complaint alleges and the answer admits that on February 27, 1927, at New York city, for good consideration, the defendant promised and agreed to insure, protect and indemnify the plaintiff against certain losses, damages and expenses. The loss to the plaintiff involved in claim in this action arose out of the personal injury sustained by one Lars Christian Hansen, while employed by the plaintiff aboard and as a member of the crew of a steamship operated by the plaintiff. The complaint and certain documents and letters which have been stipulated establish that the steamship Edward L. Shea (then called the Priscilla) was entered in the defendant insurance association; that on February 25, 1927, it was agreed in writing between the plaintiff and defendant that “ as and from February 8, 1927, the insurance afforded by this association, in connection with the entry of the above steamer ” covered the interest of the Tidewater Oil Company, the plaintiff herein, as bare boat charterer. A charter party between the owner of the vessel and the Tidewater Oil Company, the plaintiff, as charterer, the application for the entry of the steamer and some other memoranda, and the by-laws of the defendant corporation, constitute the contract of insurance.
The portions of the by-laws of the defendant corporation which particularly concern this case are set forth in precise terms of the insurance coverage:
“ Article VI. Manager. Duties of Manager.
“ Section 1. The manager shall have power to undertake the investigation and/or defense of any claim made against a member with respect to which such member shall be or may claim to be insured by the Association, to adjust and direct the payment of all losses and claims, and to employ and discharge counsel, clerks, agents or other assistants required in the conduct of the business of the Association or for the investigation of defense of claims or law suits, and shall have such other powers as the directors may-delegate.
*370 “ Article VIII. General Insurance Provisions, Period of Cover.
“ Section 1. The provisions of this article shall be applicable to all insurances of the Association.
“ Section 2. Bach member of the Association shall be insured by the Association in accordance with the application for membership and/or entry of a steamship in the Association, and with these by-laws and not otherwise With respect to each steamship entered by him from noon of the date of entry until noon of the day on which the entry of the steamship in the Association is terminated.
“ Article IX. Protection and Indemnity Insurance. Risks Covered,
“ Section 1. Each member of the Association shall be indemnified in connection with each steamship entered in the Association for Protection and Indemnity Insurance against any loss, damage or expense (not being the ‘ ordinary losses, damages or expenses ’ of the trade in which the entered steamship is employed) which the member shall become liable to pay, and shall pay by reason of the fact that he is the owner of the entered steamship, subject to the provisions of these by-laws and to all the limitations herein stated or agreed to by the acceptance of the application for membership, or by the entry of the steamship, in the Association, and which shall result from the following liabilities, risks, events, occurrences and expenditures:
“ Injury and Illness:
“ Subsection 1. Liability for loss of life of, or personal injury to, or illness of, any person, not including, however, unless otherwise especially agreed,
“ (a) liability to any employee of a member, or in case of bis death to his beneficiaries, under any compensation act, and
“ (b) liability to any seaman, or in case of his death to his beneficiaries, resulting from bis employment iti. or about stevedoring work. Liability hereunder shall also include burial expenses, not exceeding $100 where reasonably incurred by the member for the burial of any seaman.
11 (a) Each claim hereunder is subject to a deduction of $50.
“ (b) Insurance hereunder in connection with the handling of cargo for an entered steamship shall commence from the time of receipt by the member of the cargo on dock or wharf, or on craft alongside for loading, and shall continue until due delivery thereof from dock or wharf of discharge or until discharge from steamship on to a craft alongside.
“ Subsection 13. Costs and Charges. Costs and charges reasonably incurred and paid by the member in defense against any liability insured under these by-laws, subject, however, to the same *371 franchise deduction that would be applicable under these By-laws to the liability defended; provided that if any liability is incurred and paid by the member as aforesaid, the franchise deduction shall be applied to the aggregate of the claim and expenses of defense; and provided further that no member shall be entitled to indemnity hereunder unless counsel was employed, and the costs and charges were incurred, with the approval in writing of the directors or manager, or the directors shall be satisfied in their absolute discretion, that such approval could not have been obtained under the circumstances without unreasonable delay, or that such costs and charges were reasonable and properly incurred, and the directors, in allowing such costs and charges where incurred without consent, may make such deduction therefrom as they deem reasonable.” The facts as testified to on the trial by witnesses called and the documentary proofs and stipulations appear as follows:
Lars Christian Hansen, a member of the crew of plaintiff’s steamship Edward L. Shea, was injured aboard that vessel on August 4, 1927. The steamer arrived at Pier 1, Bayonne, N. J,, early that morning, with a cargo of crude oil in her tanks, in bulk, not in cases or barrels, and shortly after arrival commenced unloading the cargo, using her own pumps operated by her own steam, About three-forty-five p. m. the same afternoon another vessel, the Tydol, took a berth at the same pier to load a cargo of gasoline, and as a safety precaution all fires on the Shea were extinguished when the loading of gasoline to the other vessel was about to commence. In anticipation of this situation, at about two o’clock p. m., a three-inch metal spiral hose was run between a valve on a steam line on the pier and a valve on a steam fine on the deck of the Shea, so that when the Shea’s fires were extinguished steam could be supplied from shore. Steam was used aboard the Shea for several other purposes, in addition to operating cargo pumps, for instance, in operating the machinery which generated the electricity for lighting the vessel, for operating the sanitary pumps for the washrooms and toilets, for heating purposes in the pantry and galley, for general heating purposes in the winter, and for propelling power when the vessel was under way. After having been connected up at about two p. m,, there was no occasion to use the metal spiral hose or the steam from shore until about four-thirty p. m., when the second vessel was ready to commence loading operations. The fires on the Shea then having been extinguished, and the steam on her boilers and lines having been spent, the shore steam was turned on. About five minutes thereafter, the metal hose burst near the point where it was connected to the ship’s valve, the hose whipped and lashed about, struck Hansen, *372 who was standing on the deck of the vessel, knocked him down, severely injuring and scalding him with escaping steam.
Plaintiff seeks to recover $12,500 paid to Hansen in settlement of his claim for personal injuries, and paid with the prior consent and approval of the defendant. Hansen had sued for $50,000. The correspondence shows that he and his attorneys were traded down from a settlement offer of $25,000 (Exhibit 9, letters from Hatch & Wolfe of March 13,1928, and defendant March 17,1928) to the $12,500 mentioned. This sum the defendant (letter May 19, 1928, Exhibit 9) approved as to amount. In paragraph 15 of its answer in this action defendant admits that it approved $12,500 as being “ a proper amount for the plaintiff to pay to Lars Hansen.”
The documentary evidence shows that the very day following the accident the defendant insurance company had an expert naval architect, engineer and surveyor investigate the accident. (See his full report — Exhibit 16 ■— addressed to the defendant’s managers, of his examination at Bayonne, where the accident occurred, made on August 5, 1927.)' The same day this expert submitted bis written report to the defendant, August eighth, the defendant wrote •to the Tidewater Oil Company that Hansen “ was injured without fault on his part while in the service of the ship;” and the defendant further then said it had interviewed Hansen himself on August fifth; and that Hansen, “ a fine type of seaman,” had “ a serious fracture of the left leg and scalds on the right leg,” and that defendant would endeavor to keep Hansen “ out of the hands of attorneys, if possible.” The letters in evidence show that four months later the defendant again interviewed Hansen, for on December 8, 1927, Hansen was sent by the Tidewater Oil Company to the defendant insurance company with a letter of introduction asking that the defendant “ interview this man and let us have your instructions in this matter.” When Hansen started suit the plaintiff herein immediately forwarded the summons and complaint, and in reply defendant under date of December 23, 1927, wrote the plaintiff, acknowledging receipt of the summons and complaint and saying, “ The defense in this case has been referred to Messrs. Hatch & Wolfe,” and defendant instructed the plaintiff to co-operate with Hatch & Wolfe “ in every way possible.” The same day, December twenty-third, the defendant sent its files to Hatch & Wolfe. The letters in evidence show defendant’s files then to have included physicians’ reports of examinations “ injury report, statements of Terence M. Burroughs, third mate; John M. Colliton, port engineer; report of survey by Mr. Charles E. Ross ” (defendant’s expert naval architect, already referred to, who investigated *373 the case the day following the accident), and other documents. (See correspondence and letters on the dates mentioned, Exhibit 9.)
Again, two months later, under date of February 29, 1928, defendant again wrote to the plaintiff saying, “ we regret to say that the case [i. e., Hansen v. Tidewater Oil Co.] appears to be a serious one which will be extremely difficult to defend if it should be necessary to try it, for the principal reason that the plaintiff, who was injured apparently through no fault of his own, has sustained a very serious disability and will excite the sympathy of both court and jury without any doubt,” and the defendant itself then suggested and recommended that its attorneys, Hatch & Wolfe, endeavor to effect a settlement. (See letter, Exhibit 18.) (Italics mine.)
The evidence conclusively shows that the Tidewater Oil Company was hable to Hansen, and the defendant at this late date may not raise and is estopped from raising a contention to the contrary.
The defendant insurance company is shown to have had full and complete knowledge of all the facts from the outset and to have undertaken the investigation and defense of Hansen’s claim and may not, after payment of liability was made by the plaintiff insured, refuse to reimburse the plaintiff. Particularly is this true when we consider defendant’s procedure, and its own repeated admissions and statements that Hansen was without fault and would recover, and that the case was difficult to defend and should be settled. This necessarily lulled the plaintiff into a feeling of security and deprived plaintiff of the opportunity of trying out in the action brought by Hansen the issue which defendant now for the first time advances, that there was no liability to Hansen. The letters in evidence show defendant itself repeatedly to have said and urged that Hansen was without fault, that there was liability to him, and to have suggested that Hatch & Wolfe, the attorneys they appointed, try to effect a settlement with Hansen, which settlement they approved in advance. It would be unconscionable to permit an insurance company to deny liability on one stated ground which did not involve but rather conceded liability to Hansen, defend the action through attorneys it appointed, recommend and cause it to be settled, and thereafter shift its position, repudiate its sole ground of alleged non-liability under its policy, and then offer another; the insurance company is estopped from so doing.
Eefendant has admitted in its answer that Hatch & Wolfe, attorneys and counselors at "law, were “selected, appointed and retained * * * to defend the action mentioned in paragraph tenth of the complaint * * * and authorized * * * to investigate the case.” (Answer, 12.) That Hatch & Wolfe did *374 defend and that Hatch & Wolfe reported to the defendant and the defendant in turn reported to the plaintiff is established beyond dispute by the volume of letters marked in evidence and which speak for themselves.
The law is well settled on this point. (See Rosenwasser v. Globe Indemnity Co., 224 N. Y. 561, affg. 183 App. Div. 882,)
In Utterback-Gleason Co. v. Standard Accident Ins. Co. ([Third Dept.] 103 App. Div. 646) it was held (at p. 653): <f When a party with knowledge or sufficient notice of his rights freely does what amounts to a recognition or adoption of a contract as existing, or acts in a manner inconsistent with its repudiation, he assents to it and is equitably estopped from impeaching it, although it originally may have been void or voidable.” (Affd., 233 N. Y. 549.) (See, also, Sachs v. Maryland Casualty Co., [2d Dept.] 170 App. Div. 494; Rosenbloom v. Maryland Casualty Co., [1st Dept.] 153 id. 23.)
Under the act of Congress of June 5, 1920, known as the Jones Act (U. S. Code, tit. 46, § 688), any seaman who suffers personal injuries has the benefit of the acts of Congress applicable to railroad employees for any injury resulting from the negligence of a fellow employee or from any defect or insufficiency in any equipment,
The Jones Act provides that any seaman who shall suffer personal injury in the course of his employment may, at bis election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in oases of personal injury to railway employees shall apply.”
The railway employees’ statute, mentioned in the Jones Act, supra, is the act of Congress of April 22, 1908 (Chap. 149). It provides in section 1; “ Every common carrier by railroad * * * shall be liable in damages to any person suffering injury while he is employed by such carrier * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.” (U. S. Code, tit. 45, § 52.)
Chapter 2, section 53, title 45, of the Code of Laws of the United States (35 U, S. Stat. at Large, 66) provides: “ Contributory negligence; diminution of damages. In all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in bis death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be *375 diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.”
The uncontradicted testimony at the trial was that the hose burst as the result of a water hammer. Plaintiff’s witnesses so testified. Defendant's own expert so reported. The hammer was due to the failure to drain the accumulated water out of the hose after it had stood connected for two and one-half hours. It should have been disconnected and drained immediately before it was used, and the licensed personnel of the vessel should have actively overseen the job. Those in command of, and owning and operating, a vessel must provide a safe place for seamen to work. (Robert v. U. S. S. B. Emergency Fleet Corp., 240 N. Y. 474; Sleemas v. S. S. Kinghorn and Brittania Steamship Co., 1924 A. M. C. 619.) That Lars Hansen was a seaman is obvious and of Course must be conceded. He was a member of the crew, regularly signed on the steamship’s articles, and sailed with the vessel wherever she went. This duty to furnish a safe place to work is a non-delegable duty and rests solely on the owners and officers of the ship. Should the officers of the ship delegate that duty to someone not connected with the ship, the ship or its owners are liable:
“ The duty of a master £ to use reasonable diligence to furnish his servants a safe place and Safe instrumentalities for the accomplishment of the Work to be done ’ is primary; and for any failure to do so ‘ the master is answerable not only for his own neglect, but for that of any servant to whom he may delegate the duty. In respect thereof such servant is a vice-principal without regard to the rank which, in other respects, he may hold in his master’s service.’ Sowles v. Norcross Bros. Co., 195 Fed. 889. More shortly, £ the duty to furnish safe appliances is the duty of the master and is one that cannot be delegated.’ Simpson v. Atlantic Coast Shipping Co., Inc., 191 A. D. 844, affirmed 232 N. Y. 533.” (Sleemas v. S. S. Kinghorn and Brittania S. S. Co., 1924 A. M. C. 619.)
In the instant case Lars Hansen’s superiors owed a non-delegable duty to Hansen to see that the hose was used and operated in such a manner that it would not cause injury to Hansen. As Mr. Justice Cakdozo has said in Cortez v. Baltimore Insular Line, Inc. (287 U. S. 367, at 377): ££ This court has said that ‘ the ancient characterization of seamen as u wards of admiralty” is even more accurate now than it was formerly.’ Robertson v. Baldwin, 165 U. S. 275, 287.”
*376 Whether Hansen was guilty of contributory negligence is immaterial in the instant case. The statute clearly specifies that contributory negligence is not a bar to a recovery by an injured seaman, but can only be considered in mitigation of damages. Thus the rule of comparative negligence, so well known in admiralty, is forced upon the State courts. The courts of this State enforce this rule of comparative negligence, although unknown to any other phase of the law in the State courts. (Bolles v. Munson S. S. Line, Inc., 235 App. Div. 175.)
On the foregoing, aside from the moneys paid to Lars Hansen by the plaintiff, the plaintiff is entitled to recover in the instant case the other expenses it paid, on any negligence whatever. In Robert v. U. S. S. B. Emergency Fleet Corp. (240 N. Y. 474), Judge Cardozo, writing for the court, in affirming a judgment for a seaman plaintiff injured while painting the side of a ship and while standing on a float alongside of the ship, which it was shown was an unsafe place to work, stated: “We think that evidence of negligence, though slight, is not lacking altogether.”
If the defendant’s contention that the injury came under one cf the excepted risks of the policy was a defense, it should have been pleaded and proven.
In order for the defendant to avail itself of the defense that the injury was caused while doing stevedoring work and that it was due to the privity or negligence of the owner or managing officer, both of which causes defendant asserts to be excepted risks under the policy, it was incumbent upon the defendant to affirmatively plead and establish that the injury was incurred from a cause within the scope of these exceptions.
14 Ruling Case Law (§ 599, p. 1437) states: “Where proof is made of a loss apparently within a policy, the burden is on the insurer to prove that the loss arose from a cause for which it is not hable. Accordingly while the plaintiff in an action on an accident policy must prove that the death was caused by accidental means, yet where prima facie evidence of that fact has been adduced, the defendant must show that the death of the insured resulted from an excepted cause.”
Likewise, in Agricultural Insurance Co. v. Rothblum, Inc. (147 Misc. 865) Justice Collins, delivering the opinion of this court with reference to the burden of pleading and proving that the loss of articles covered by a policy of theft insurance occurred through a cause excepted from the coverage of the policy, said (at p. 867): “ The ‘ policy covers loss of and/or damage to the * * * property or any part thereof arising from any cause whatsoever,’ excepting the enumerated causes. If the insurance was limited to loss *377 by theft, the plaintiff would, have to prove the loss by that method, just as in the case of a policy against loss by fire the fire must be shown. (Providence Washington Ins. Co. v. Youmans, 82 Misc. 433.) These exceptions are conditions subsequent rather than conditions precedent. ' The purpose of the exception in normal situations is simple and obvious. It is inserted in the contract for the purpose of withdrawing from the coverage of the policy, as delimited by the general language describing the risk assumed, some specific risk which the underwriter declares himself unwilling to undertake * * * the occurrence of an excepted peril * * * does not in the least affect the binding force of the contract.’ (Vance Ins. [2d ed.] pp. 405, 406.) In an action by the insured against the insurer the onus would not be upon the insured to allege and prove, as a condition precedent, that the loss was not occasioned by the specified exceptions. Bather it would be incumbent upon the insurer to allege and prove, as a condition subsequent, that the loss arose from one of the excepted causes.”
In Danerhirsch v. Travelers Indemnity Co. ([1st Dept.] 202 App. Div. 207) it was held that a clause in a burglary insurance policy avoiding liability in the event books of account were not kept by the insured is a condition subsequent which must be pleaded by the insurance company in order to be available as a defense, and the court accordingly affirmed an order denying a motion to dismiss the complaint, Justice Smith saying (p. 207 et seq.): “ This is an action to recover upon a policy of burglary insurance. The only question submitted to the jury was the question of damages. The policy contained this provision: ' The company shall not be liable for damages to the premises, furniture, fixtures, safe or vault therein * * * unless books of accounts are kept by the assured and the company can accurately determine therefrom the actual amount of loss or damage sustained.’ I can read this provision in no other way than as a condition subsequent, rendering the policy void if such books of account are not kept. It does not prescribe how proof shall be made in an action upon the policy, or what proof may be necessary to sustain such an action. It simply makes ineffective the policy if such books are not kept as will show accurately the extent of the plaintiffs’ loss. That such books were not kept seems to be admitted, and if the defendant had pleaded the breach of this condition subsequent, such a fact would have been a complete defense to the action. But such defense is not here pleaded.
“ The defendant made a motion to dismiss the complaint upon the ground that such books were not kept, and the plaintiffs’ counsel answered that motion by asserting the fact that such defense had *378 not been pleaded and no amendment was sought to be made to the answer.”
O’Connell v. New Jersey Fidelity & P. G. Ins. Co. ([3d Dept.] 201 App. Div. 117), a frequently cited authority on the foregoing proposition, held that a clause in a policy of automobile insurance relieving the insurance company from liability if the automobile at the time of the accident were driven by a child under sixteen years of age, is a condition which if existing reheves the insurance company of liability, but that the burden of proof is on the insurance company to establish such fact.
That these contentions of the defendant in this case are without merit is demonstrated by the fact that they were not raised until the very trial of this action. Again reverting to the defendant’s letter of August 8, 1927 (Exhibit 19), in which the sole ground for denial of liability was expressly stated by the defendant to be “ that the hose which gave way was part of the equipment of the pier and did not belong to the ship.” It has been shown that the defendant’s own records prove it to have been in full and complete possession of knowledge of the facts through statements which it had taken from eye witnesses, its conferences with Hansen himself, and its investigation and report by the expert naval architect and surveyor, and by its own attorneys, Hatch & Wolfe. And after all this the defendant, under date of February 29, 1928, in a letter to the Tidewater Oil Company (Exhibit 18), expressly reasserted its sole alleged defense in the following language: “ With respect to the question of coverage, we beg to call your attention to our letter of August 8th, 1927, in which we advised you that the facts of this case, namely, the bursting of the steam hose which was a part of your dock equipment, indicate that the liability is not one properly coverable by this Association, which is concerned only with your liability as shipowners. As Managers of the Association, we find it necessary to advise you that liability in this case may not fall within the Club coverage unless the Directors should decide otherwise.” Defendant should, therefore, not only because of the rules of pleading, but because of the unequivocal position which it took, be estopped from now raising or contending for any other alleged defense than the one and the only one which is so deliberately, exclusively and four-square asserted.
The evidence shows that Hansen was not doing stevedoring work.
Here again the cases to which reference has been made are applicable; that the defendant should have pleaded and proven that Hansen was a stevedore or doing stevedoring work, to have brought the case within this exception in the policy.
*379 There was no privity or negligence on the part of the plaintiff corporation or the managing officers, within the meaning of section 9, article IX, of defendant’s by-laws.
Assuming that Colliton was in some Way party to or had knowledge of the conditions which caused the bursting of the steam hose, his knowledge or negligence was not that of a “ managing officer ” and could not be imputed to the Tidewater Oil Company. As a matter of law he was not a managing officer. He had no general authority or powers of discretion over the affairs or operations of the company, even at the particular plant where he Was employed. He was at most a foreman empowered only to inspect or supervise details of repairs, etc., under the control and order of his superior, the marine superintendent at the plant. Even Colhton’s title shows him to be a subordinate. He testified as to his duties: “ Q. Will you tell us now in the course of your general Work and your daily duties what an assistant marine superintendent has to do, what his job is, and what work he accomplishes during an ordinary day? A. At Bayonne, I look after the dispatching of the vessels, the voyage repairs, make surveys and inspections of the vessels and see that everything goes along all right during the time the vessel is in at our pier. I also look after repairs of construction, and attend to surveys and any other work that the marine superintendent may assign me to. Q. Do you have anything to do with the crews on the ship, or the personnel? A. Also look after the hiring of personnel. Q. You hire the men, or you assist the marine superintendent in hiring the men to serve on the ships themselves? A. Yes.”
In Hanover Fire Insurance Co. v. Merchants’ Transp. Co. (15 F. [2d] 946) the Circuit Court of Appeals for the Ninth Circuit treated in a general way the question of an insurance company’s liability for loss due to the negligence of the shipowner under a policy of protection and indemnity insurance, the court taking the view that inasmuch as the very purpose of protection and indemnity insurance was to indemnify the shipowner against losses arising from his own negligence or that of his agent or employees, which indemnity was not available under any other form of marine insurance, that the negligence of the shipowner Would not avoid the policy unless it was so gross as to amount to a willful or deliberate wrong. The court said (p. 948); “ The object of this form of insurance is to afford protection to shipowners, in addition to that afforded by the ordinary marine policy, and the contract should be construed with that object in view. When so construed, we are Clearly of opinion that it covered damages paid for loss of life *380 arising from the negligence of the ship or shipowner; for, in the absence of negligence on the part of either, there would be no loss or liability to be indemnified against. And, if the policy covered loss arising from negligence, the courts will not attempt to distinguish between the different ldnds or degrees of negligence, unless, as agreed by counsel, the negligence was so gross as to amount to a wilful, deliberate, and intentional wrong.”
The United States Supreme Court, in Craig v. Continental Ins. Co. (141 U. S. 638), held that a marine inspector sent to the assistance of a stranded vessel, arid who supervised the pumping and floating of the stranded vessel (during the course of which a member of the crew was drowned), was not a managing officer to whose knowledge or negligence the owner of the stranded vessel could be said to be privy, the court saying (at p. 647): “ He [the marine inspector] was at most a mere employee of the corporator. He was not its general agent, nor, so far as appears, had it any knowledge of his appointment. If he was an agent at all, his powers were no greater than those of the master of a vessel, for whose negligence the owner is not liable, even though the privity or knowledge of the master exists. The knowledge of Reardon was not the private knowledge of the corporation.”
The Circuit Court of Appeals for the Ninth Circuit held in The Princess Sophia (61 F. [2d] 339) that a freight and passenger agent of the Canadian Pacific Railway Company, the highest in authority at the company’s branch at Juneau, Alaska, was not such a managing agent of the company as to establish a privity on the part of the company for his acts or neglect.
Kramer v. Buffalo Union Furnace Co. ([4th Dept.] 132 App. Div. 415) dealt with the question of whether a person in the defendant’s employ designated as assistant superintendent was a person upon whom valid service of process could be effected so as to obtain jurisdiction over bis corporate employer; the court in holding he was not such a managing agent, saying (at pp. 417 et seq.): “ So that we come to the consideration of the question whether Sammon was a ' managing agent ’ within the meaning of the statute. The duty which he performed and the position which he occupied is fully set forth in his affidavit and there is no controversy upon the subject. He states: ‘ I go to the company’s plant at Hamburg Street between six and seven o’clock in the morning and make a general inspection of the plant, taking notice of any particular thing that should be done around the plant. I then see that these things are done, going to the General Superintendent about them when they are of special importance. During the day I direct, under the general supervision and authority of the General Superintendent, the work of some four *381 hundred men employed at the plant. If occasion demanded I would hire and discharge men, always acting under the general supervision of the General Superintendent.’ He further states that such have been his duties and his employment for a year and a half and ever since he entered into the employ of the defendant; that his position was designated as ' Assistant Superintendent. ’ He further says, and it is uncontradicted: ‘ There is a General Superintendent employed by the company, who has charge of the operation of this plant. I am under him and responsible to him as Assistant Superintendent, and I report to him and receive from him directions and instructions as to the lines along which I am to work.’ The duties which he has performed, as above set forth, he says were assigned to him by the general superintendent, and were performed under his supervision and oversight. Sammon further says: ‘ I have a desk in the General Superintendent’s office and it is my office also. I consult with him about the company’s affairs and receive directions from him, and with and from no other officer or employee of the company. He is the only person to whom T report and am responsible.’ * * *
“ Under this state of facts, it seems to me clear that Sammon was not a ‘ managing agent ’ within the meaning of the section of the Code. It appears without contradiction that Sammon had no general authority in the conduct of the defendant’s business. His authority was limited by such orders or directions as were given him by his superior, the general superintendent. He was not authorized to take any independent action in the premises. All he did was subject to the approval of the general superintendent, to whom he was required to make report of all his actions. Notwithstanding the designation of Sammon as assistant superintendent, it is perfectly apparent that he was only a foreman. He went to the plant each morning, arriving as early as the other workmen; made a general inspection; set the men to work, and presumably was charged with the duty of seeing to it that they performed their respective duties, but he was in no sense a ‘ managing agent.’
“ The defendant cannot by subrogation avail itself of a cause of action against the plaintiff.”
The defendant, in contending that it was not hable because of the fact that the hose which burst was part of the shore equipment (letter, August 8, 1927), sought to avail itself of an alleged right of subrogation arising by reason of the terms of the contract of insurance. In so doing the defendant endeavors to set up the plaintiff theoretically as two different entities; one, the Tidewater Oil Company as operator of the dock and owner of the hose; and two, the Tidewater Oil Company as operator of the ship. Defendant *382 seeks to say that the operator of the ship has a cause of action against the owner of the hose or dock, It is settled law that any right of subrogation which the defendant might have had, as insurer of the ship, against the owner of the dock, is lost where the ownership is common. It was so held in Globe & Rutgers Fire Ins. Co. v. Hines (273 Fed. 774; certiorari denied, 257 U. S. 644). The Circuit Court of Appeals for the Second Circuit in that case said (at p. 777): “ The insurers stand by subrogation in the shoes of the insured, and can claim no more than the insured could claim. It follows that there can be no right of subrogation, if the ship which is injured and the ship which commits the injury are owned by the same party. In Phoenix Insurance Co. v. Erie Transportation Co., supra, the court, speaking through Mr, Justice Gray, said:
“ ' For instance, if two ships, owned by the same persons, came into collision by the fault of master and crew of the one ship and to the injury of the other, an underwriter, who has insured the injured ship, and received an abandonment from the owner, and paid him the amount of insurance as and for a total loss, acquires thereby no right to recover against the other ship, because the assured, the owner of both ships, could not sue himself.’ ”
Defendant asserts that $1,495,80 was paid for maintenance and cure. This is contrary to the pleadings, Without supporting testimony or foundation in fact, and directly contrary to the evidence.
The evidence clearly shows that the sum of $1,495.80 did not represent payments for maintenance and cure, but that on the contrary the sum was made up, save and except for one item, of expenses of defending the suit brought by Hansen, including attorneys’ fees of $776.80 paid to Hatch & Wolfe, and other items of expense such as doctors’ bills for examining Hansen for the purpose of court testimony, etc. The group of letters (Exhibit 9) further shows that the items comprising this sum of $1,495.80, with the one exception already mentioned, were for the most part incurred by Hatch & Wolfe; that Hatch & Wolfe forwarded the bills for the items to the defendant insurance company for payment; that the insurance company in turn sent them to the plaintiff, who issued checks, and that the checks and receipts passed through the defendant insurance company, Hatch & Wolfe having their dealings and correspondence with the defendant in this action.
The exception mentioned concerned the item of $538 paid to the Bayonne Hospital for treatment of Hansen during his confinement there. Payment of a hospital bill falls far short of meeting the legal obligation of maintenance and cure.
The law is well settled that a seaman is entitled to his living expenses, board and lodging or other reasonable necessaries, as *383 well as to doctors’ bills, medical bills, and hospital bills during the period of any hospital confinement, and the obligation to the seaman does not cease upon his discharge from the hospital but continues for whatever time beyond hospitalization may be reasonably necessary to effect whatever medical treatment may be expected to effect a cure and to the point where a cure has been accomplished in so far as it is reasonably capable of accomplishment, (Skolar v. Lehigh Valley Railroad ([2 C. C. A.] 60 F. [2d] 893, at 895.)
In McLean v. S. S. James E. Ferris and Pioneer Steamship Co. (1932 A. M. C. 1410) Judge Knight, delivering the opinion in the United States District Court for the Western District of New York, said: “ While libellant does not specifically ask for ‘ maintenance and cure,’ he does ask that he be given such relief as he is entitled to receive under the old rule and under the old rules he may be entitled to ‘ maintenance and cure,’ though not entitled to indemnity damages. The cases uniformly support this statement. ‘ Maintenance and cure ’ as construed and applied by the text writers and courts, comprehend sustenance and care for a reasonable period of time following the injury. What amounts to or constitutes a reasonable period depends upon the condition in each individual case ” (p. 1416).
Neither the pleadings nor the evidence in this case establish, as defendant contends they do, that the sum of 112,500 was not paid to Hansen because of damages for his injuries incident to the obligation of maintenance and cure; or that it was paid to him by way of damages for his injuries incident to or arising out of his tort claim for negligence. The liability to an injured seaman, either for maintenance and cure or in tort for negligence, is one for unliquidated damages, in an amount indefinite and indeterminate until fixed by the court and jury — but fixed and determined in the instant case by defendant’s express agreement to the settlement it initiated and approved. Defendant wrote on August eighth that Hansen was “ injured without fault on his part while in the service of the ship.” Again, under date of February 29, 1928, defendant by letter reiterated that Hansen had sustained a very serious disability through no fault of his own and would excite the sympathy of both court and jury, and defendant in that letter initiated settlement suggestions and recommended that Hatch <fe Wolfe “ endeavor to effect a settlement,” Defendant’s letters left no room for defendant to have done otherwise than admit, as it did in paragraph 15 of its answer, that it had expressly approved in advance the payment of $12,500 to Hansen. No qualification or limitation of any kind whatever was then made or involved and none can now be injected, as to whether the payment was *384 wholly or partially for maintenance and cure or wholly or partially for negligent tort.
The amount paid Hansen having been finally fixed and determined, the question was then only and now can only be whether there was any liability to Hansen; and that question now cannot be altered or varied by the further and immaterial question as to whether the liability was in tort for negligence, or liability for maintenance and cure; but rather only, whether there was liability to Hansen for whatever reason or under whatever rule.
Besides reiterating its warning of lack of fault on Hansen’s part, his serious disability, that he would excite the sympathy of court and jury, defendant in its letter to plaintiff of February 29, 1928, said, “ We believe that you will agree it will be advisable for Mr. Hatch to ascertain the possibility of settlement as soon as possible.” (Exhibit 18.) Pursuant to this suggestion, $12,500 was paid to Hansen, and under date of May 19, 1928, defendant again wrote the plaintiff, acknowledging receipt of the releases from Hansen and saying, “ The settlement was made by the Tidewater company with the Approval of the Association [i. e., the defendant] only as to amount.”
Indisputably there being liability — ■ and liability for maintenance and cure cannot possibly be denied —■ and the amount being fixed, and the insurance contract or policy or by-laws providing for an indemnification for any liability for personal injury, that is the end of this case; a verdict was properly directed, and any contrary verdict must necessarily have been set aside. The defendant cannot be heard to say that Hansen’s complaint in his suit against the Tidewater Oil Company in the New York Supreme Court (Exhibit 5) sounded only in tort for negligence and did not separately plead a cause of action for maintenance and cure. That is immaterial. The question is not whether Hansen pleaded all available causes of action, but was the Tidewater Oil Company liable, whether for maintenance and cure or otherwise. Further, Hansen could at any time have amended bis complaint, even on the opening of the trial.
The defendant shows an entire misconception and misunderstanding of the trial testimony. The testimony was not, as defendant urges, that the failure to open the drain cock in the pump room was the cause of the accident; or that if the drain cock had been opened there would have been no accident; or that (as defendant seefiis to infer in urging the case of Unadilla Valley R. R. Co. v. Caldine, 278 U. S. 139, as applicable) Hansen violated any instruction or order in failing to go below and open this drain cock. The testimony was that the failure to drain the hose of water before *385 steam was let into the hose caused a water hammer. The testimony further was that the water could have been and should have been cleared out of this hose by disconnecting the hose and draining it immediately before the steam was turned on. Opening of the drain cock in the pump room was testified to have been merely an additional means which could have been taken, besides disconnecting the hose, which would have aided in draining the water out of the hose. There was no testimony whatever that failure to open this drain cock was the sole or the only cause of the water remaining in the hose and causing the water hammer which burst it. The testimony, further, was quite clear and unequivocal that one of the licensed officer personnel of the vessel should have been present and supervised the shift from ship to shore steam, seeing that the hose was drained and the drain cock opened, and that it was the failure of these officers to be present and do their job, and not any fault on the part of Hansen, which brought about the accident. In this connection, Mr. Colliton testified on cross-examination by defendant’s counsel: “ Q. Are you blaming Mr. Hansen for this accident that he had? A. No. Q. If it should have been open, Mr. Hansen is the man who should have opened it? A. No, it is the engineer that is in charge. Q. You just finished telling us that Mr. Hansen was in charge of the pump-room, didn’t you? A. I said he was in charge under the supervision of one of the ship’s officers. * * * Q. Then I ask you again: Are you trying to suggest to this jury that Mr. Hansen was the one responsible for his own injury? You told us that the hose was in good condition. A. I do not look to the pump man for responsibility. We as a rule hold the licensed personnel responsible.”
On redirect Mr. Colliton further said: “ Q. In operation of any of the machinery connected with it, what department is that under? A. That comes under the engineer’s department. Q. Does the engineering officer of the vessel have anything to do with the steam when it is being used for pumping purposes for cargo? A. They have everything to do with the steam. Q. What do you mean by that? A. They have general supervision of the steam throughout the vessel. * * * The Court: Who had charge at the shift? By Mr. Pyne: Q. Under whose department supervision does the shift, and the work connected with it, from the operation of pumps on ship steam to pumps on shore steam come within, who has jurisdiction? A. The engineering department. Q. What is the custom? A. The custom is that the first assistant engineer, a licensed man, looks after the reception of the steam, or working under the direction of the chief engineer. Q. Anything having to do with the machinery of any kind aboard the ship is in charge *386 of and under the supervision of the engineering force? A. The engineering force, yes, sir.”
Two licensed officers were proved to have been aboard at the time, the third mate, Mr. Burroughs, who was on deck forward and who had charge of the deck operations and keeping the vessel in trim as her cargo was pumped out; and the first assistant engineer, Mr. Mueller, who Mr. Colliton said, could not be found, but who, it was proven, was in one of the rooms with several others in a dice game.
As has been pointed out, the defendant insurance company, after it had full knowledge of all the facts and advice of counsel, repeatedly asserted that the Tidewater Oil Company was hable to Hansen and that Hansen was seriously injured without fault on bis part, and initiated and approved in advance the $12,500 settlement.
The correspondence established beyond question that the defendant named Hatch & Wolfe as attorneys to defend Hansen’s action, and instructed the plaintiff to co-operate with these attorneys. Defendant’s answer so admits, but attempts to inject a further quibble to the effect that the defendant appointed Hatch & Wolfe to act as plaintiff’s attorneys. Of course Hatch & Wolfe were necessarily attorneys of record for the Tidewater Oil Company in Hansen’s suit, but that they were appointed by and dealt with and reported to the defendant, cannot in the face of the correspondence be gainsaid.
The proof shows that the defendant thus definitely and conclusively committed itself that the plaintiff was liable to Hansen, that Hansen was without fault, and that the amount paid Hansen was proper; and in addition, having had its attorneys defend Hansen’s action, the defendant may not now shift its ground and contend, not only that Hansen was at fault, but that he was alone and solely at fault.
The defendant’s statements at the time Hansen’s claim and suit were pending, and the defendant’s agreement to and inducement of the settlement, could have had and did have no other effect or result than to lull the plaintiff into a sense of feeling of security that its liability to Hansen would not thereafter be questioned by the defendant. Indeed the defendant actually and expressly contracted that it would not thereafter question that liability. Certainly, if the defendant had then taken the position it now asserts, that Hansen was at fault and that the defendant was not liable, the plaintiff might well have, and for the purposes of this action it should be concluded that it would have taken defendant Hansen’s action to trial and adjudicated any question of its liability to him; and the plaintiff would not be prejudiced, as it is now, by having lost that opportunity.
*387 As a matter of law the defendant may not under the circumstances of this case so shift its position.
In Rosenbloom v. Maryland Casualty Co. ([1st Dept.] 153 App. Div. 23) Judge Scott, delivering the opinion of the court, said (at p. 25): “ The defense mainly relied upon is that the injury for which Goldstein recovered judgment was not a liability insured against by the terms of the policy. Whether it was or not is perhaps open to question, but that question we are not called upon to consider. As has already been said the complaint in the Goldstein case disclosed precisely the nature of his claim and the ground upon which he sought to hold the owners liable, so that when the defendant assumed the defense of the action it had every means of ascertaining whether or not the loss was one for which it was liable under its policy. It is perfectly well settled that under such circumstances, an insurer who has, with full knowledge, undertaken the defense of an action, and deprived the assured of any control of it, will be deemed estopped to deny that the accident was within the terms of the policy. * * * [Citations.] * * * As this court pointed out in Brassil v. Maryland Casualty Co. (147 App. Div. 815) the position of an insurer who denies its liability from the first and refuses to defend, is quite different from that of one who elects to defend and thus ousts the assured from any opportunity to defend himself.”
In Sachs v. Maryland Casualty Co. ([2d Dept.] 170 App. Div. 494) Judge Thomas, delivering the opinion of the court, said (at p. 497): “ In some of the authorities cited the facts show that the abandonment of the defense left the insured in a more disadvantageous position than in the present instance. But in my judgment the assured did not prove an estoppel in pais. The insurer cannot assume to operate under a provision in its favor and then cast the burden on the assured upon the plea that the latter cannot prove that he is the worse for it. The insurer chose its position; there were alternatives; it freely selected one; it should not be permitted to toss that aside and take another.”
Cases cited by defendant, such as Devens v. Mechanics & Traders’ Ins. Co. (83 N. Y. 168), are in accord entirely with plaintiff’s contention. There is nothing to bring the defendant in the instant case within that portion of the Devens case which says that a defendant may not present a defense merely because it “ negligently, or incautiously,” when the claim was first presented, omitted to do so. Here, as has been pointed out, defendant after very full and thorough investigation by its own expert marine architect and engineer, and after it had full knowledge of the facts and affidavits and statements from the eye-witnesses, full physicians’ reports, *388 and at least two interviews with Hansen, repeatedly, and in the words of the Devens case " deliberately and cautiously ” stated that Hansen was without fault, that the Tidewater Oil Company was liable, that Hansen should be kept away from a judge and jury whose sympathy he certainly would arouse, and that his claim should be settled for $12,500. The defendant’s acts obviously deprived the Tidewater Oil Company of the opportunity of trying out any possible question of .liability to Hansen and is certainly the evidence referred to in the Devens case which would not only justify but demand findings that the defendant herein “ with full knowledge of the facts ” had “ an intention to abandon ” any claim that Hansen was negligent or that the Tidewater Oil Company was not liable to Hansen, and that the Tidewater Oil Company was misled to its injury.
There was no issue of fact whatsoever that required submission to the jury, nor were there any inferences that may be drawn therefrom favorable to defendant’s claim. Upon the facts as established, there was but a question of law.
Motion to set aside the verdict of the jury is in all respects denied. Exception to defendant. Defendant to have thirty days’ stay of execution after notice of entry of judgment and sixty days to make and serve a case on appeal: