## LYON COUNTY BANK Et Al. v. LYON COUNTY BANK Et Al.

No. 3135

June 16, 1936.

58 P. (2d) 803.

42

*John Davidson* and *William M. Kearney*, for Appellants:

*A. L. Haight* and *F. H. Koehler*, for Respondent Lyon

County Bank Mortgage Corporation; *Gray Mashburn,* Attorney-General, *W. T. Mathews* and *W. Howard Gray,* Deputy Attorneys-General, for Respondents Lyon County Bank and E. J. Seaborn:

## OPINION

By the Court, COLEMAN, J.:

The complaint in this case alleges that the plaintiff is a corporation organized and existing under the laws

of Nevada; that it brings this suit for the benefit of the bondholders of the Nevada Copper Belt Railroad Company, a corporation, which exists pursuant to the laws of the State of Maine; that plaintiff corporation is the duly and regularly appointed, qualified, and acting trustee of said railroad company, as provided in a certain deed of trust, pursuant to which plaintiff did institute proceedings to foreclose said trust deed and procure the appointment of a receiver for said railroad company; that under the terms of said trust deed plaintiff bank was and is empowered to collect, receive, hold, and disburse certain funds in trust for the bondholders of said railroad company.

The complaint further alleges that until February 16, 1932, it was engaged in the banking business, and that on or about said day the defendant E. J. Seaborn, in his capacity as state bank examiner, took charge of said Lyon County Bank pursuant to the banking laws of the state; that thereafter the office of bank examiner was discontinued and the office of state superintendent of banks was created, and the said Seaborn, as such superintendent, took charge of said Lyon County Bank and its assets and affairs, pursuant to the Banking Act of 1933 (Laws 1933, c. 190 [N. C. L. sec. 747 et seq.]) ; that from about the month of March 1933, the said Seaborn, as such superintendent of banks, has continued in charge of the assets of said bank until on or about October 23, 1933, when the court directed that the assets of said bank be turned over to the defendant Lyon County Bank Mortgage Corporation, by judgment duly and regularly entered in pursuance of the banking act of 1933.

It is further alleged that by the judgment aforesaid certain funds claimed to be trust funds and preferred claims against the Lyon County Bank were ordered held by the defendant Seaborn, as superintendent of banks, and are now in the hands of said Seaborn, as such superintendent, pursuant to the requirement of said act of 1933, and that the funds herein involved are now in

the hands of said superintendent of banks, pursuant to statute.

It is further alleged that on July 1, 1932, said Seaborn, as such bank examiner, gave notice to all persons having claims against plaintiff bank, requiring them to file their claims with him as such bank examiner on or before September 2, 1932; that the plaintiff bank, as trustee, filed with said Seaborn, as state bank examiner, its proof of preferred claim, which was thereafter rejected and disallowed; that said preferred claim arises by virtue of the fact that there was in the hands of the said Lyon County Bank, on the date said Seaborn, as bank examiner, took charge of said bank, the sum of $18,789.30, by virtue of the deed of trust aforesaid. Plaintiff bank further avers that there are no offsets against said trust fund.

The defendants demurred to the complaint upon the following grounds: That the complaint does not state a cause of action; that it appears that the plaintiff as trustee has not legal capacity to bring this suit; that there is a defect or misjoinder of parties defendant; that it cannot be ascertained from the face of plaintiff's complaint what interest the Lyon County Bank, a corporation, has in this suit; that it cannot be ascertained from the face of plaintiff's complaint what interest E. J. Seaborn, as superintendent of banks, has in this suit; that the complaint is ambiguous; that the complaint is unintelligible; that the complaint is uncertain—all of which are grounds of demurrer under section 8596 N. C. L.

The learned trial court sustained the demurrer upon the ground that the plaintiff had not legal capacity to sue. The theory upon which he reached this conclusion was that the same person cannot control both the prosecution and defense of an action. The authorities relied upon to sustain the conclusion are: Buckeye Refining Co. v. Kelly, 163 Cal. 8, 124 P. 536, Ann. Cas. 1913E, 840; Brown v. Mann, 71 Cal. 192, 12 P. 51; Byrne et al. v. Byrne, 94 Cal. 576, 29 P. 1115, 30 P. 196; Globe &

Rutgers Fire Ins. Co. v. Hines (C. C. A.) 273 F. 774; Hagood v. Goff, 208 Ala. 642, 95 So. 21; Swope v. Swope, 173 Ala. 157, 55 So. 418, Ann. Cas. 1914A, 937; Barber v. Barber, 32 R. I. 266, 79 A. 482; In re Divelbess' Estate, 216 Iowa, 1296, 249 N. W. 260; Langford v. Johnson, 46 Ga. App. 444, 167 S. E. 779.

■■ Let us first determine what is meant by the ground of demurrer "that the plaintiff has not legal capacity to sue," as that term is used in section 8596 N. C. L.

David Dudley Field, a leading lawyer of New York, was instrumental in having a code regulating pleading adopted in that state about 1858. It became so popular that the code of New York, with slight changes, has been adopted in many states. That code contained the provision under consideration here, and the courts of New York have frequently referred to it. In 1859 the court of final resort in New York was called upon to interpret this provision, in the case of Bank of Havana v. Magee, 20 N. Y. 355, in which the court said: "Certain persons, as infants, idiots, lunatics and married women, cannot sue except by guardians, next friends, committees, or in the case of married women, by joining their husband in certain cases. This, I think, was what the provision refers to."

Such has been the consistent holding of that court. Ward v. Petrie, 157 N. Y. 301, 51 N. E. 1002, 68 Am. St. Rep. 790. Such, we think, is the uniform construction. Jackson v. Dines, 13 Colo. 90, 21 P. 918; Los Angeles Ry. Co. v. Davis, 146 Cal. 179, 79 P. 865, 106 Am. St. Rep. 20; Debolt v. Carter, 31 Ind. 355; 21 R. C. L. p. 526, sec. 87; Pomeroy's Code Rem. (4th ed.) sec. 125.

While the lower court adopted the wrong theory in sustaining the demurrer, in justice to it we may say the point above considered was not suggested by counsel in this court, and consequently we assume was not called to the attention of the lower court.

But it is said that, since the judgment is right, it should not be reversed.

One of the theories upon which that contention is based is that upon which the lower court sustained the demurrer. While we do not find it necessary to decide this question, our investigation leads us to assume that the rule is based upon the idea that the plaintiff controls both the prosecution and the defense in the case. If we can judge from the vigor with which the defense in this matter is urged, no such condition prevails in the instant matter. Furthermore, it is questionable if such a serious point can safely be disposed of on demurrer. The various phases of this question are considered in the decisions above referred to, and in the cases cited in 1 C. J. pp. 983 and 984, and in 1 C. J. S. p. 1074.

It appears from the allegations in the complaint in this matter that respondent Seaborn "took charge of said Lyon County Bank pursuant to the banking laws of the State of Nevada."

Sections 53 and 54 of the banking act of 1911 (sections 702 and 703 N. C. L.) read in part as follows:

"§ 53. Whenever it shall appear to the examiner that any bank to which this act is applicable has violated its charter or any law of the state, or is conducting its business in an unsafe and unauthorized manner, or its capital is impaired, or it shall refuse to make the reports herein provided for, or refuse to permit its affairs to be examined by the examiner or his deputies or agents, or shall refuse to comply with any lawful requests or orders of the examiner or the state banking board; or shall suspend payment of its obligations; or if from any examination or report provided for in this act, the examiner shall have reason to conclude that such bank is in an unsafe or unsound condition to transact the business of banking, or that it is unsafe and inexpedient for such bank to continue in business, the examiner may forthwith take possession of the property and business of such bank and retain such possession until such bank shall resume business or its affairs be finally liquidated as herein provided. * * *

"§ 54. Upon taking possession of the property and

business of such bank, the examiner is authorized to collect moneys due to such bank and do such other acts as are necessary to conserve its assets and business, and shall proceed to liquidate the affairs thereof as hereinafter provided. The examiner shall collect all debts and claims and enforce all liabilities and rights of action accrued to or belonging to such bank, and may institute and prosecute all proper and necessary actions for that purpose, and may sell or compound all bad or doubtful debts, and upon the order of the district court for the county where the bank carried on business, may sell all the real and personal property of such bank on such terms as the court shall direct; and may, if necessary to pay the debts of such bank, if a corporation, enforce the individual liability of its stockholders."

 In view of the allegation in the complaint, which we have quoted, we must conclusively assume that the state bank examiner had good and sufficient reasons, under the statute, to take possession of the property and business of the plaintiff bank and to administer the affairs thereof. So far as we can say, the plaintiff bank, at the time the bank examiner took charge, was conducting its affairs in such an unsafe and unauthorized manner as to jeopardize the trust imposed in it. When such a condition admittedly existed, it was the imperative duty, under the statute, of the bank examiner to take charge of the business and assets of the plaintiff. Power et al. v. Amos, 94 Fla. 411, 114 So. 364; 3 Michie on Banks, p. 47. Stepping into the shoes of the plaintiff, as trustee, he assumed all of the responsibilities of the trustee. The question of the administering of the trust is not involved in this matter, however.

 The lower court took the view that the complaint could not be amended, and ordered a dismissal of the action. It is urged that this was error necessitating a reversal. We do not think the order was prejudicial. It affirmatively appears from the allegations of the complaint that the bank examiner took possession of the bank pursuant to the banking laws of the state. This

allegation is admitted by the general demurrer. In this situation we do not see how there can be an amendment.

The judgment and order are affirmed.

### ON PETITION FOR REHEARING

September 14, 1936. 60 P. (2d) 610.

*W. M. Kearney,* for Appellants.

*A. L. Haight,* for Respondent Lyon County Bank Mortgage Corporation.

## OPINION

By the Court, COLEMAN, J.:

Plaintiff has filed a lengthy petition for a rehearing.

The respondents in their original brief filed in this case state: "It is our position briefly that it was the statutory duty of the state bank examiner to take over all of the property and business, including trust funds, if any, of the bank under the conditions which existed on February 16, 1932, and that, if any trust funds thereby came into the possession of the state bank examiner, the same should be disbursed among the respective cestue que trustent upon the presentation and establishment of proper claims therefor; that all such funds,

after having passed into the possession of the state bank examiner, are in the custody of the law and that the state bank examiner (now superintendent of banks) is the officer charged with all the responsibilities of a trustee for the benefit of the cestue que trustent; that the corporate organization of the defunct bank is not authorized to interfere with the bank examiner's possession and is precluded by law from so doing, and that no court has jurisdiction to appoint another person as trustee to interfere with the possession or duties of the state bank examiner in that behalf * * *."

Plaintiff, in the closing brief, said: ."We are in accord on the proposition that the superintendent of banks had the legal right to take what he found after closing the doors of the bank to the public, but such taking does not pass title to trust funds to him."

This was the identical point upon which we based our opinion.

The plaintiff is a creature of the banking act, from which we quoted in our former opinion. It is subject to all the provisions of that act. We quoted section 53 of it (Comp. Laws, sec. 702), at length. That section provides that if the bank examiner shall have reasons to conclude that a bank is in an unsafe or unsound condition he shall forthwith take possession of the property and business thereof and retain such possession until such bank shall resume business or its affairs be finally liquidated, as provided.

The complaint alleges that on February 16, 1932, the defendant Seaborn, in his capacity as state bank examiner, took charge of said bank pursuant to the banking laws of the state, and that thereafter, as superintendent of banks, he took charge of said bank and its assets and affairs, pursuant to the banking act of 1933, and has continued in charge thereof.

The demurrer admitted these allegations, hence we were and are of the opinion that the superintendent of banks lawfully came into possession of the trust fund in question.

52

■ Upon what theory can it be said that a bank which is in the business of acting as a trustee, and as such comes into possession of funds, should, in the face of our statute, be permitted to administer the same when it (bank) becomes unsafe or unsound? We think it was clearly the legislative intent that when such a trustee became unsafe or unsound, the superintendent of banks should step in and protect the cestui que trust.

As we pointed out in the former opinion, the superintendent of banks, in such a situation, assumes all of the responsibilities of the trust.

The petition is denied.

JENNIE PICETTI, APPELLANT, v. JOE M. ORCIO AND MARIE ORCIO, HIS WIFE, ANGELO ORCIO, PEDULLA GIORGIO, JOE DOE AND RICHARD ROE, RESPONDENTS.

No. 3096

June 30, 1936. 58 P. (2d) 1046.

*J. M. Frame* and *W. M. Kearney,* for Appellant:

*L. D. Summerfield,* for Respondents:

## OPINION

By the Court, COLEMAN, J.:

This is a suit to recover judgment upon a promissory note purporting to have been executed by defendants Joe M. Orcio and his wife, and to foreclose a mortgage alleged to have been executed by them to secure the payment of said note. The court entered a personal judgment only against Joe M. Orcio, and a judgment in favor of the other defendants.

Plaintiff has appealed from so much of the judgment as was adverse to her, and from the order denying a motion for a new trial.

In July 1919, the defendant Joe M. Orcio, Marie Orcio, his wife, Angelo Orcio, and Pedulla Giorgio purchased the ranch in question. The Doe family do not appear to have any interest in the ranch. It appears from the undisputed testimony of the defendants that each of them paid one-fourth of the purchase price of the ranch and they were named as grantees in the deed of conveyance.

It is the theory of the plaintiff that the defendants Joe Orcio and Marie Orcio, his wife, executed the note and mortgage in question, and that though the other two owners in the ranch did not sign the note and mortgage, the four constituted a partnership in the ownership and operation of the ranch, and that Joe Orcio had the authority to bind the four by the execution of the note and mortgage. It is the contention of

each of the defendants that they are tenants in common and own an undivided one-quarter share in the ranch, and that the ranch constitutes a homestead in fact.

It appears that Joe Orcio and his wife borrowed $500 from the Washoe County Bank, in December 1919, and later (in 1920), a thousand dollars, both of which loans were secured by their joint mortgage upon the ranch; that thereafter (in 1921) Joe Orcio borrowed $2,500 from Philip Curti, and that a note therefor, and a mortgage securing the same, purporting to be executed by Joe M. Orcio and Marie Orcio, his wife, were delivered to him; that in 1928, Curti desiring to obtain the money on said last-mentioned note and mortgage, and Orcio being unable to pay it, negotiated a sale of the same to this plaintiff, who being desirous of a new note and mortgage, the one in question here was drawn, and admittedly executed by Joe Orcio, but denied by Marie Orcio. It is conceded that the other two defendants did not sign either the note or mortgage.

The first contention we will dispose of is whether the defendants were partners in the purchase and operation of the ranch, and whether Joe Orcio was the managing partner and had full power to bind the other defendants in the execution of the note and mortgage.

In support of the rule of law relied upon, counsel cite Adams v. Blumenshine, 27 N. M. 643, 204 P. 66, 67, 20 A. L. R. 369; Whitney v. Dewey, 158 F. 385, 86 C. C. A. 21; Sumner v. Hampson, 8 Ohio 328, 32 Am. Dec. 722.

In the first-named case the court says: "The presumption is always against the inclusion in the firm assets of real estate held by the partners as tenants in common. * * * The mere use of the property for firm business is only a slight circumstance tending to show that the premises were intended to be partnership property."

The other two cases just mentioned are of no aid to us in deciding the question involved.

We think that the correct rule to be applied in a

situation such as confronts us is stated in 20 R. C. L.
p. 854, sec. 61, as follows: "There is some uncertainty
as to what must be shown in order that real property
may be considered a portion of the firm assets. The
rule which has the support of the best authority, and
which rests on sound principle, is the one which makes
the intention of the parties at the time of taking the
conveyance the proper test. In other words, the ques-
tion is one to be determined from the intention of the
parties, or as it is sometimes said, from the agreement
of the parties. In all cases the presumption is against
the inclusion of the real estate, and in order that it may
be treated as belonging to the partnership the intention
must be clearly manifested. There is also a presump-
tion that the ownership of real estate is where the muni-
ment of title places it. If by all the circumstances
attending the transaction, it is made to appear that, in
the intention of the parties, it was purchased for and
was treated as partnership property, the presumption
of ownership arising from the face of the deed will be
overcome, and the property will be treated as belonging
to the partnership."

In an early case arising in Virginia, where two men
bought a tract of land with a mill situated upon it,
which (mill) was operated as a partnership, the court
said: "I consider Wheatley and Calhoun as joint owners
of the realty, and partners only in the milling business
carried on upon the property. There may, indeed, be
partnerships in the business of milling, or mining, or
farming; but unless the intent of the joint owners to
throw their real estate into the fund as partnership
stock is distinctly manifested, or unless the real prop-
erty is bought out of the social funds, for partnership
purposes, it must still retain its character of realty.
Considering the partnership as a third person, the titles
of the individual partners cannot be passed to it, per-
haps, without violating the statute of frauds, unless it
be by express agreement in writing, or unless, by pur-
chasing with partnership funds, an implied trust is

raised in its favor. In this case, I see nothing from whence to infer that there was any design on the part of these joint purchasers to convert their real estate into partnership stock; nor am I better satisfied, that the property was purchased with, or paid for out of, partnership funds. To raise a trust by such purchase it must have been made at the time with partnership funds or on partnership responsibility. The payment, incidentally, out of those funds of an installment due upon an antecedent contract on individual responsibility cannot raise such a trust, or give title to anything but reimbursement." Wheatley's Heirs v. Calhoun, 12 Leigh, 264, 273, 37 Am. Dec. 654.

In Parsons on Partnership (4th ed.), at section 265, it is said: "Real estate purchased for partnership purposes, and appropriated to those purposes, paid for by partnership funds, and necessary to partnership purposes, always becomes partnership property."

The same author, at section 266, says: "We consider that the three elements we have above stated must unite in order to make the real estate necessarily partnership property."

Counsel quotes from the case of Hogle v. Lowe, 12 Nev. 286, as follows: "When property is purchased with partnership funds for partnership purposes, and appropriated to partnership uses, no further proofs should be, and certainly none are, required in order to establish the evident intention and agreement of the partners. In such case, every act impresses upon the property the character of personalty."

Even this quotation contemplates a purchase with partnership funds, which was not the fact in the instant case. And counsel failed to quote the following language in the same paragraph: "But the mere fact that real property held by members of the firm as tenants in common is used by the partners in the partnership business for partnership purposes, or an agreement to so use it, is not of itself sufficient to convert it into partnership stock; there must be some evidence of further

agreement to make it partnership property. (Vol. 1, Am. Lead Cas. 496). At law, real property used by a partnership is deemed to belong to the person in whose name the title by conveyance stands; and it is so considered in equity, until it is shown to be partnership property, either by evidence establishing a proper agreement, or by proof of purchase with partnership funds for partnership purposes."

It is said in 47 C. J. 677: "While, in accordance with general rules, an agreement beween joint owners of property to carry on a common trade or business and to share the profits and losses thereof will constitute a partnership, a mere community of interest, such as exists between tenants in common or joint tenants of real or personal property, does not make such owners partners or raise a presumption that a partnership exists, and this is so, even though they cooperate in making improvements in their property and in realizing and sharing the profits or the losses and expenses arising therefrom."

■ Without reviewing the evidence at length, we may say that all four of the defendants testified that each paid out of his own private funds one-fourth of the purchase price of the ranch. The wife testified that she earned the money she paid, partly before her marriage, as a trained nurse. Each of the witnesses testified that the individual purchasers acquired an undivided one-fourth interest in the property, and that they purchased the ranch for ranching purposes, each to receive one-fourth of the profits and to share equally the losses, if any. While the testimony of the defendant Joe Orcio, as to certain funds which went into improvements, and as to other phases of the case, is very unsatisfactory, we cannot say that it clearly appears that the finding of the trial court on this phase of the case was erroneous, and such finding must stand.

Counsel for appellant call to our attention several authorities which expressly recite the fact of an express agreement between the partners, at the time the real

estate is appropriated to the use of the firm, to the effect that it shall become a partnership asset. They are not in point, since there was no such agreement in this case.

Counsel do not refer to the case of Arnold v. Stevenson, 2 Nev. 234, where it was held that one partner has no authority to mortgage the real estate of the firm, and we do not find it necessary to determine the correctness of that holding.

■ The next question is whether or not Mrs. Orcio signed and acknowledged the mortgage in question, so as to charge the homestead interest of herself and husband with the debt. She testified that she did not sign it, and her husband testified that he signed her name to the deed, at the time he signed his name to it. To justify this court in reversing a judgment of the trial court on a question of fact, it must clearly appear that the trial court reached the wrong conclusion. Can we say in this case that the trial court did reach a wrong conclusion on the point in question?

We are satisfied that the trial court did not give due consideration to the weight which should be given to the certificate of the notary public, who certified to Mrs. Orcio's signature. We say this for the reason that the law on the point was not called to our attention, either in the briefs or the oral argument, which is very strong reason to believe that it was not suggested to the lower court.

Mrs. Orcio admitted signing two previous mortgages given on the ranch, one executed in 1919 and the other in 1920, the latter just a year before the mortgage to Curti was given, of which the one in question is in reality a renewal. She testified that the notary who certified to her signature to the Curti mortgage and to the one in question at no time sought to take her acknowledgment. The notary, who is an attorney and who prepared the two mortgages, pursuant to instructions, and who was in no way blamable for failure to include the other two owners as mortgagors, testified that at the

time the husband signed the mortgage he told him that it would be necessary that his wife sign it also. He testified that the husband said it was impossible for her to come in at the time, to sign; and that, after waiting a few days, he drove out to the ranch, exhibited the note and mortgage to the wife, told her what they were, and that she must sign them; that she took them in the house and brought them back with her signature attached, handed them to him, saying she knew all about them, whereupon he certified to her signature in due form. Mr. Curti testified that he was in the attorney's office at the time that the husband signed the mortgage, and that he did not sign his wife's name thereto, as he testified.

■ What is the law pertaining to the impeachment of a certificate of acknowledgment of a notary public? The rule stated at section 267 of John's American Notaries (4th ed.) is as follows: "Certificates of acknowledgment may usually be impeached only for fraud, conspiracy, collusion or imposition, and clear, convincing and satisfactory proof is required."

In 46 C. J. at page 519, it is said, relative to impeaching a notary's certificate: "It may be contradicted or impeached by other competent evidence, but clear and convincing proof by disinterested witnesses is required."

1 R. C. L. p. 297, sec. 88, states the rule as follows: "The decisions disclose a very decided tendency on the part of the courts to attach weight to certificates of acknowledgment and to view attempts to discredit them with suspicion and distrust. It frequently has been stated as a rule that in order to impeach a certificate the evidence must be clear, cogent and convincing beyond reasonable controversy."

The supreme court of the United States, in Young v. Duvall 109 U. S. 573, 576, 3 S. Ct. 414, 416, 27 L. Ed. 1036, in considering the weight to be attached to the certificate of a notary public, said: "Of necessity, arising out of considerations of public policy, his certificate must, under circumstances disclosed in this case, be

regarded as an ascertainment, in the mode prescribed by law, of the facts essential to his authority to make it; and if, under such circumstances, it can be contradicted, to the injury of those who in good faith have acted upon it,—upon which question we express no opinion,—the proof to that end must be of such a character as will clearly and fully show the certificate to be false or fraudulent. Northwestern Mut. L. Ins. Co. v. Nelson, 103 U. S. 544, 547 [26 L. Ed. 436]. The mischiefs that would ensue from a different rule could not well be overstated. The cases of hardship upon married women that might occur under the operation of such a rule are of less consequence than the general insecurity in the titles to real estate which would inevitably follow from one less rigorous."

The supreme court of Alabama, in Miller v. Marx, 55 Ala. 322, in disposing of this question, referred to and quoted from one or two cases sustaining the rule above stated. In that case the court said: "The question we are discussing is not new in the courts of justice. When families are about to lose the protection of the roof-tree, and to be turned homeless upon the world, it is but human that they should resort to every means within their power to avert so dire a calamity. Interest is no longer a disqualification to testify, under the statutes of this state. Impelled by keen apprehension of want, it is not surprising that parties to the suit, when on the witness stand, should testify under undue bias, no matter how honest their intentions to tell only the truth may be. Wives rarely join in a conveyance or incumbrance of a homestead, without a suppressed misgiving or reluctance. When in after years—perhaps after the death of the husband—such conveyances are about to be enforced, and the family dispossessed, how easy to prove by the wife herself, and perhaps by the children who have all the while been around her, that her signature was not voluntary, and that she did not assent to the conveyance. If such testimony can prevail to set aside solemn conveyances, acknowledged or proved, and

certified according to the forms of law, what confidence can the public repose in land titles? It is much less hurtful that cases of individual hardship should be endured, than that, on testimony always open to distrust, the repose of society should be disturbed by so fearful discredit cast on the titles to real estate."

The supreme court of Washington, in Western L. & S. Co. v. Waisman, 32 Wash. 644, 73 P. 703, 704, in dealing with this question, said: "That the evidence required to overcome a certificate of acknowledgment must be clear and convincing is generally held, and it may well be said that where fraud or duress is not shown as a circumstance attending an acknowledgment, the unsupported testimony of parties directly interested in the impeachment is not of that clear and convincing character that is necessary to overcome a record and an official act."

In a note to Ford v. Ford, 7 Ann. Cas. 245, a long list of cases is cited in support of the rule that to impeach a certificate of a notary public to an acknowledgment the evidence must be clear, cogent, and convincing beyond reasonable controversy; and in the same note many cases are cited to sustain the proposition that the testimony of interested witnesses is insufficient to overcome the force of the certificate of acknowledgment. As to this latter proposition we do not find it necessary to express an opinion. See 1 Devlin on Deeds, sec. 529.

*Per Curiam*:

Rehearing granted.

ON REHEARING

April 30, 1937. 67 P.(2d) 315.